KNOLL, Judge.
A jury found Lay Down Service, Inc. liable to Francis Hollier for personal injuries he received when a 1500 to 2000 pound trough it used to lay down pipe fell and struck Hollier in the back. The jury awarded Hollier $625,000 damages. In the formal judgment the trial court recognized the entitlement of Cliffs Drilling, Hollier’s employer, to reimbursement of worker’s compensation benefits it paid.
Lay Down appeals, contending the trial court erred: (1) in applying an incorrect standard of review when it denied its motion for JNOV on the issue of liability; (2) in refusing to grant its motion for JNOV because it found that reasonable men could not conclude other than that Lay Down’s actions were the legal cause of Hollier’s injury; (3) in refusing to’ grant Lay Down’s motion for JNOV on the issue of the extent of Hollier’s entitlement to damages for the future loss of wages, and future medical expenses. We affirm.
FACTS
On June 26, 1983, Hollier was working for Cliff’s Drilling as the derrickman on a surface drilling rig. Shortly before 3:00 a.m., Lay Down personnel, John Hinson *748 and Frank Butcher, commenced lay down operations. After the lay down operation was started, Hinson and Butcher suspended their operation just after laying down the first joint of pipe, and went to the lower section of the rig to straighten the sleeve that holds the gin pole to which the lay down equipment is connected. Hinson and Butcher left the trough resting on the two 2 inch “ears” on its stand, and slacked the cable which pulled the trough to and from the rig. The record does not show how high above Hollier’s head the trough was, but the trough was on a catwalk and the trough stand is approximately two and one half to three feet in height; therefore, the trough was several feet above Hollier’s head. While Hinson and Butcher were straightening the gin pole sleeve, Hollier began rolling pipe at the pipe rack about eight feet from the trough. Hollier testified that as he was rolling pipe, he saw the trough falling toward him. As Hollier attempted to flee, the trough struck him in the back and knocked him to the ground.
As a result of the accident, Hollier injured his neck, back, and wrist. Eventually he underwent a lumbar fusion at the L4-5 level, and surgery on his left hand was required to relieve a carpal tunnel syndrome.
The jury found Lay Down totally at fault for causing the accident, and awarded Hol-lier $200,000 for general damages, $350,000 for loss of earnings, past and future, and $75,000 for medical expenses, past and future.
JUDGMENT NOTWITHSTANDING THE VERDICT
Lay Down contends that, considering all of the evidence in light of and with reasonable inferences most favorable to Hollier, reasonable minds could not conclude other than that Lay Down did not act negligently. On this basis, Lay Down argues that the trial court applied an incorrect standard of review and should have granted its motion for JNOV or, in the alternative, its motion for new trial.
The standard for determining the propriety of granting a JNOV is the same as used to determine whether a directed verdict should be granted. Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3rd Cir.1983), writ denied, 437 So.2d 1149 (La.1983). In Rougeau, at page 1166, we stated:
“Louisiana courts adopted the standard for ruling on a motion for a directed verdict applied by the Federal courts. That standard was enunciated by the Third Circuit in Campbell v. Mouton, 373 So.2d 237 (La.1979), which quoted the following language of the U.S. Fifth Circuit Court of Appeal in Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969):
‘On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence — not just that evidence which supports the non-mover’s case— but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.’
In applying this standard the court can not weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979).”
In reviewing a JNOV we apply the manifest error rule to the judge’s conclusions on liability and quantum. Lopez v. Chicago Bridge and Iron Co., 546 So.2d 291 (La. App. 3rd Cir.1989), writ denied, 551 So.2d 1323 (La.1989).
Lay Down’s first argument is that in rejecting its motion for JNOV, the trial court used an improper standard. Lay Down focuses on the trial court’s state *749 ment at the end of its written reasons for judgment that it would not second-guess the jury’s decision unless there was a complete absence of probative facts to support the jury verdict. It argues that this statement shows that the trial court used the “scintilla rule” which the courts utilized prior to Boeing and Campbell. We disagree.
The trial court quoted in extenso that portion of the Boeing opinion which is applicable to the disposition of motions for JNOV. In addition, the trial court analyzed the testimony in light of that standard, finding credibility determinations which the jury was required to resolve, evidence about various theories of negligence from which it could draw its conclusions about Lay Down’s liability, and expert testimony on both sides regarding Holder's loss of income and the need for future medical treatment. After carefully reviewing the entirety of the trial court’s written reasons for judgment, we cannot say that it applied an incorrect standard in denying Lay Down’s motion for JNOV.
Lay Down’s major argument to the jury was that Hollier was responsible for causing the accident. It argued that Hollier raised the arm of the trough stand, causing the trough to disengage and fall on him. The jury rejected this argument. In its response to special verdict interrogatories, the jury decided that Hollier was not at fault, and that Lay Down was the sole cause of the accident. After carefully reviewing the evidence, we cannot say that the jury determination of this issue was manifestly erroneous.
Notwithstanding, Lay Down contends that even if the jury resolved the credibility issue of whether Hollier caused the trough to fall adverse to its contention, Hollier nonetheless failed to present sufficient factual evidence by which reasonable minds may conclude that Lay Down acted in a negligent manner. It argues that the jury’s determination of Lay Down’s liability is so speculative and unreasonable that it was the duty of the trial court to render JNOV.
In Rougeau, at page 1167, we further stated:
“The party against whom a motion for judgment notwithstanding the verdict is made must be given the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. However, the court is not bound by inferences which are unreasonable.
“ ‘It is the province of the jury to resolve conflicting inferences from circumstantial evidence, but permissible inferences must still be within the range of reasonable probability. It is the duty of the court to withdraw a case from the jury when a necessary inference is so tenuous that it rests merely upon speculation and conjecture.’ ” Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.1958) cert. denied, [358 U.S. 908], 79 S.Ct. 234, [3 L.Ed.2d 229].
There is no bright line which enables the court to distinguish between the reasonable, legitimate inference and the unreasonable, illegitimate inference. There is no precise rule to follow. The court can only test the reasonableness of the inferences drawn by the jury from the evidence in terms of probability. An inference is legitimate only where the evidence offered makes the existence of the fact to be inferred more probable than not. Any lesser test would allow the jury to rest a verdict on speculation or conjecture.”
Furthermore, in Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972), the Louisiana Supreme Court stated 264 So.2d at pages 635-636:
“... [I]n Jordan v. Travelers Insurance Co., 257 La. [995, 245] So.2d 151, 155 (1971), we summarized ... [the plaintiff’s burden of proof in civil cases as follows]:
‘In describing this burden of proof, the courts sometimes speak of proof to a “ ‘reasonable certainty’ ” or to a “ ‘legal certainty’ or of proof by evidence which is of “ ‘greater weight’ ” or “ ‘more convincing’ ” than that offered to the contrary; or (in the case of circumstantial evidence) of proof *750 which excludes other reasonable hypotheses than the defendant’s tort with a “ ‘fair amount of certainty’ Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not.’
Further, as we specifically held in Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), by this burden of proof, the circumstantial evidence requisite in civil negligence cases need not negate all other possible causes of injury, as the opinions of the previous courts seemed to hold. It sufficies if the circumstantial proof excludes other reasonable hypotheses only with a fair amount of certainty, so that it be more probable than not that the harm was caused by the tortious conduct of the defendant. 153 So.2d [at] 396-397.
In this respect, the principle of ‘res ipsa loquitur’ (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury in the absence of other as-plausible explanation by witnesses found credible. Thus, by this principle where properly applied, the circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.
We noted in Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389, 391 (1957): ‘ * * * the maxim [res ipsa loquitur] means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference ... The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circum-
stances to invoke the rule, an inference of negligence ... When all the evidence is in, the question is still whether the preponderance is with the plaintiff.’ Nevertheless, when all the evidence is in and the question is whether, by reason of the res ipsa loquitur rule, the plaintiff has preponderantly proved that the defendant is responsible in tort for his injury, we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: ‘Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the most plausible explanation of the accident?’ On the other hand, application of the principle is defeated if ‘an inference that the accident was due to a cause other than defendant’s negligence could be drawn as reasonably as one that it was due to his negligence.’ This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the negligence of the defendant.” (Citations and footnotes omitted.)
In light of the principles enunciated hereinabove, we find that the doctrine of res ipsa loquitur is applicable to the case sub judice. The evidence preponderates that Lay Down’s negligence was the most plausible or likely cause of the fall of the trough which injured Hollier. In reaching this conclusion, we cannot as reasonably attribute any other cause, and rely upon the following facts:
It was the testimony of lay and expert witnesses alike that lay down operations are specialized and dangerous. The most dangerous areas identified were the catwalk where the stands rest and the trough itself. It was undisputed that Lay Down did not secure the area around its equipment, and did not give any warnings when its employees left the area. Likewise, the evidence establishes that at the time of the accident Hollier was properly in the area, supervising the pipe rolling.
*751 In the ease sub judice, Butcher and Hin-son, the only two Lay Down employees on the premises, testified that they left the catwalk area so that they could straighten the sleeve that holds the gin pole some 40 yards away from the lay down equipment. With the trough, weighing between 1500 and 2000 pounds, just resting on the two 2 inch “ears” on the stand, they left the truck winch on, but disengaged (in neutral), and left the catwalk area unattended. In addition, because of the adjustments they had to make at the drilling well itself, the Lay Down employees left approximately 8 feet of slack in the cable; thus, there was nothing to restrict the horizontal movement of the trough should it fall from the stand.
It is clear that only Lay Down’s employees had access to the controls of the lay down truck, and no one other than Lay Down’s operators manipulated the lay down equipment prior to the accident to position the trough on the stand. Despite Lay Down’s employees’ assertions that they properly rested the trough on the stand, the record clearly establishes that the trough was not supposed to fall and that something had to cause it to fall.
After carefully considering the evidence, it would be unreasonable to conclude that Hollier, who is familiar with lay down work and who is an experienced oil field worker, would have lifted one arm of the stand, which was several feet above his head, while the trough was resting on the small “ears” of the stand. There was no pipe in the trough when it fell. The record is void of any evidence to suggest why Hollier would even attempt to lift one arm of the stand under these circumstances. The evidence suggests that the most reasonable cause of the accident was that Lay Down’s employees negligently positioned the trough on its stand, and left it unattended. Without the intervention of negligence by Lay Down, the accident would not have happened.
In making this determination, we are not persuaded by Lay Down’s argument that after the accident, the lay down crew made no repairs to its equipment and continued its operations without incident. By the same token, there was no evidence that at any time after the accident, Lay Down’s two employees left the trough resting on the stand unattended or with the cable slacked so that the trough’s horizontal movement was unrestricted.
Therefore, we find that the trial court properly denied Lay Down’s motion for JNOV.
NEW TRIAL
Lay Down contends that the trial court improperly denied its motion for new trial, and utilized an improper standard in reaching that conclusion.
The only arguments advanced by Lay Down constitute discretionary grounds.
In Lamb v. Lamb, 430 So.2d 51 (La.1983), the Louisiana Supreme Court stated at page 53:
“La.C.C.P. art. 1973 provides that the trial court may grant a new trial if there exists good grounds therefor. A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered. We have recognized that the court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse.” (Citations omitted.)
After carefully reviewing the arguments of Lay Down, many of which were also made in support of its motion for JNOV, we cannot say that the trial court was manifestly erroneous in denying Lay Down’s motion for a new trial.
QUANTUM
Lay Down next contends that the trial court erroneously denied its motion for JNOV with regard to the jury’s award for Hollier’s loss of future earnings, and the award for future medical expenses. Lay Down does not contest the jury’s awards for general damages, loss of past earnings, and past medical expenses.
The jury awarded Hollier a lump sum of $350,000 for loss of earnings, past and future. Hollier’s expert economist was *752 Dr. Randolph Rice. He opined that Hollier’s loss of past earnings was $106,000. Dr. Stuart Wood, Lay Down’s expert, opined Hollier’s loss of past earnings was $99,000. Accordingly, the jury impliedly awarded between $251,000 ($350,000 less $99,000) and $244,000 ($350,000 less $106,-000) for Hollier’s future loss of wages.
The jurisprudence concerning future loss of wages is well established and will not be reproduced herein. See Freeman v. Harold Dickey Transport, Inc., 467 So.2d 194 (La.App. 3rd Cir.1985).
At the time of trial, Hollier was 46 years of age. He had a ninth grade education and had worked in the oil field for almost all of his adult life, working as a floorhand, derrickman, motorman, driller, and then toolpusher for various companies. At the time of his accident, Hollier had accepted a job with Cliffs Drilling as a derrickman, a step down from his previous employment which was necessitated by the slow down in the oil industry, and was earning $22,-771.83 per year.
Hollier was first treated by his family physician, and then by Dr. Louis Blanda, a orthopedist. After Dr. Blanda confirmed that Hollier had a ruptured disc in the lumbar region, he referred Hollier to Dr. S. Henry LaRocca, another orthopedist, for further evaluation and treatment.
At Dr. LaRocca's first examination, Hol-lier complained of pain in the lower back, pain in his neck with numbness and weakness in his right hand. After examination of Hollier, Dr. LaRocca attributed all complaints to the June 26, 1983, accident. Because of the severity of pain in the lower back, the course of treatment began with that complaint. On August 20, 1985, Dr. LaRocca performed a laminotomy with a spine fusion at the L4-5 level. A second surgery was performed on March 11, 1986, by Dr. LaRocca to release the median nerve in the wrist (carpal tunnel syndrone). A CAT scan taken in 1987 also showed a posterior midline bulge of the disc in the neck at C4-5. At the time of trial, Dr. LaRocca was attempting to treat the neck problem conservatively.
At trial, Dr. LaRocca opined that with just the surgeries to the lumbar region and the wrist Hollier had a 38 percent permanent impairment to the body as a whole. Dr. LaRocca summarized Hollier’s limitations as follows:
“His limitations are against repetitive bending and twisting at the waist, and lifting and carrying articles of any major weight over 25 pounds. Less than that, he could do with some frequency, but certainly not more than that. Those restrictions are arising primarily from the low back condition.
The neck condition ... would preclude heavy lifting once again, and vigorous use of the upper extremities for pushing and pulling or for working overhead, because with a disc problem in the neck if one is required to do those things, then he could get into a position where we would have to do something surgical about that problem in his neck.
So his activities are ... considerably restricted in comparison to what his capacities used to be and these things are permanent. I don’t think that he’ll ever be in the position to go back to what he used to do.
* 5⅜ ⅜8 * # ⅜
He’s totally disabled from those things that I specified, but he’s got a problem in a specific region of his neck, a specific region of his back, and that’s it. So he’s not paralyzed. He gets around very nicely. So, no, he’s not totally disabled; he’s very partially disabled.”
Lay Down contends that Dr. LaRocca’s assessment that Hollier is not totally disabled qualifies him to obtain employment at least at the minimum wage, doing light and sedentary work. On this basis, it contends that Hollier failed to prove by a preponderance of the evidence that he could not perform even minimum wage employment. We disagree, finding Lay Down overstates Dr. LaRocca’s testimony.
Dr. Randolph Rice, Hollier’s expert economist, testified that if Hollier was unable to work again, he had a projected work life expectancy of 13.5 years and his loss of future earnings would be $253,308.
Dr. Stuart Woods’, Lay Down’s expert economist, calculation of Hollier’s future *753 loss of wages differed significantly from Dr. Rice’s. Instead of a 13.5 year future work life expectancy, Dr. Woods, using a different study specifically involving oil field workers, only projected a 6.5 year work life expectancy for Hollier. On this basis, if Hollier could not work again, Dr. Woods projected Hollier’s future loss of wages as being between $97,588.44 and $108,987.31.
Both economists offered calculations reflective of what Hollier’s future loss of wages would be if he were able to perform work at the minimum wage. Neither economist gave an opinion of Hollier’s employa-bility with the restrictions imposed by his physical condition. No vocational rehabilitation expert testified.
After carefully reviewing the medical testimony regarding Hollier’s ability to work in the future, considering the serious physical limitations imposed by his condition, his limited educational achievement, his lingering problems in the cervical region, and his testimony of the many things he can no longer do, we cannot say that the jury erred in awarding just less than the maximum amount Dr. Rice suggested for future loss of income. Such a determination was supported by the evidence, and was not merely speculation, probability or conjecture. Accordingly, we find that the trial court did not err in denying Lay Down’s motion for JNOV on the issue of Hollier’s damage award for future loss of wages since reasonable persons could have concluded that Hollier could not work again, even at minimum wage.
Lay Down’s next argument is that the trial court erred when it did not grant a JNOV on the jury’s damage award of $30,-000 for future medical expenses.
Dr. LaRocca testified that without complications with Hollier’s neck, the projected future medical expenses would be approximately $750 per year for a yearly office visit, x-rays, and prescriptive medication. These estimations related only to Hollier’s lower back and the wrist surgery.
The record preponderates that when Hol-lier was first seen by Dr. LaRocca, Hollier complained of pain in the neck and associated numbness in the right arm commencing with his accident. A CAT scan showed some bulging of the disc at C4-5 in his neck. Dr. LaRocca told the jury that Hollier’s pain in the neck was not sufficient at that time to require surgical intervention. Nevertheless, a close reading of Dr. La-Rocca’s testimony shows that he did not rule out future surgery if Hollier’s neck condition deteriorated.
Viewing Dr. LaRocca’s testimony as a whole, we find that the jury could have concluded that Hollier would need future medical attention for his neck in addition to the maintenance treatment which his lumbar surgery required.
Although Dr. LaRocca did not estimate the cost of future neck surgery, the jury had before it evidence of the cost of Hollier’s lumbar surgery. On this basis, the jury could have awarded an amount more than the minimum $750 yearly expenses based in part on the cost of the prior surgery.
After carefully reviewing the record, we cannot say that the trial court was manifestly erroneous in denying Lay Down’s motion for JNOV for future medical expenses.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Lay Down.
AFFIRMED.