634 So.2d 927 (1994)
Betty Ann McDuff McCARTNEY, et al., Plaintiffs-Appellants,
v.
COLUMBIA HEIGHTS NURSING HOME INC., Defendant-Appellee.
No. 25710-CA.
Court of Appeal of Louisiana, Second Circuit.
March 30, 1994.
*930 C. William Gerhardt, Shreveport, for plaintiffs-appellants.
Charles S. Smith, Monroe, for defendant-appellee.
Before LINDSAY, HIGHTOWER and WILLIAMS, JJ.
LINDSAY, Judge.
This is a wrongful death and survival action filed by the children of Bernice McDuff. The plaintiffs are Betty Ann McDuff McCartney, James P. McDuff, Madge Drew McDuff James, Merle McDuff Simon and Peggy McDuff Smith. The defendants are the Columbia Heights Nursing Home and its insurer, Old Republic Insurance Company. The plaintiffs contend that their mother died as a result of improper care at the nursing home. The trial court rejected the plaintiff's claims. For the following reasons, we affirm the trial court judgment.

FACTS
Mrs. McDuff, who was 86 years old at the time of her death, had been a resident of the Columbia Heights Nursing Home since 1979 and was completely bedridden. She was able to lift her hands to her face and neck, but was unable to turn in bed. She was turned by nurse's aides every two hours. Mrs. McDuff frequently experienced urinary tract and respiratory infections with high fever.
On the morning of June 16, 1988, Mrs. McDuff reported to the nurse's aide that she was experiencing pain in swallowing and she refused her breakfast. The aide noted a small, dime-sized bruise on the front of Mrs. McDuff's neck. Throughout the day, the bruise increased in size. At the close of the day, the bruise was the size of a fifty-cent piece.
The next morning, Mrs. McDuff was admitted to the Citizen's Medical Center in Columbia. She had a high fever and symptoms of a urinary tract infection. The bruise continued to increase in size and eventually covered an extensive portion of Mrs. McDuff's neck, chest, and back. She developed respiratory distress and was transferred to the Glenwood Regional Medical Center on June 19, 1988. While at Glenwood, she developed a perforated duodenal ulcer. She underwent surgery for this condition on June 22, 1988. Following surgery, Mrs. McDuff continued to have respiratory difficulties and died on July 2, 1988.
The plaintiffs filed suit against the defendants, alleging that the personnel at the nursing home allowed Mrs. McDuff to come in contact with the side rails of her bed and that she became trapped there for a period of time sufficient to create the extensive bruise on her neck. They alleged that, in the alternative, some other negligence on the part of the nursing home resulted in the bruise. The plaintiffs also contend that the perforation of the duodenal ulcer and the respiratory distress were attributable to the initial trauma and bruising on Mrs. McDuff's neck which, through a series of events, ultimately resulted in her death.
*931 The case was tried on February 4 and 5, 1991. After the trial, the case was taken under advisement. The plaintiffs became concerned when no opinion by the trial court was forthcoming. Accordingly, they initiated inquiries to the trial judge by the Louisiana Supreme Court.
On July 23, 1992, the trial court filed written reasons for judgment. In its opinion, the trial court held that the nursing home was not negligent in causing the death of Mrs. McDuff. The trial court found that Mrs. McDuff had a history of health problems and was not admitted to the hospital because of the bruise. The court found that she was admitted due to a high fever and a confused mental state. In light of the testimony of the medical experts, the trial court found that Mrs. McDuff died of respiratory distress and heart failure which was not attributable to any action by the Columbia Heights Nursing Home.
After the trial court filed its written reasons for judgment, the plaintiffs filed a motion to recuse the trial judge, claiming that after the trial, but before the judgment, the judge's daughter became employed by the nursing home and her husband became employed by a bank which was founded by some of the same individuals who established the nursing home. Following a hearing before another judge, a judgment was entered on February 16, 1993, denying the motion to recuse. The plaintiffs then applied to this court for supervisory writs. The writ application was denied on April 7, 1993. This court found that no statutory ground for recusal had been alleged by the plaintiffs.
On April 7, 1993, the trial court filed a judgment rejecting the claims of the plaintiffs. The plaintiffs appealed.

FAULT
The plaintiffs contend that the trial court erred in finding that the Columbia Heights Nursing Home was free from fault in the death of Mrs. McDuff. The plaintiffs urge that the manifest error standard of review does not apply in this case and that this court should conduct a de novo review of the record. The plaintiffs also contend that the doctrine of res ipsa loquitur applies to this case and, under that doctrine, the evidence shows that the defendant was at fault in causing the death of the decedent. We find these arguments to be meritless.

Standard of Review
The plaintiffs contend that, for several reasons, the manifest error rule does not apply in this case. They argue that the trial court failed to adequately articulate and support its reasons for judgment and therefore the manifest error rule does not apply. They also note that much of the medical testimony was admitted through depositions and they contend that the manifest error rule does not apply to appellate review of deposition testimony. The plaintiffs further contend that, due to the trial judge's action in failing to recuse himself, the manifest error rule does not apply.
When the trial court's reasons for judgment do not articulate the theory or the evidentiary facts upon which the conclusion is based, the reviewing court will be unable to give the finding the usual deference attributed to decisions of triers of fact. Guy v. State Department of Transportation, 576 So.2d 122 (La.App. 2d Cir.1991); Thompson v. Petrounited Terminals, Inc., 536 So.2d 504 (La.App. 1st Cir.1988), writs denied 537 So.2d 212, 213 (La.1989). Further, when one or more of the trial court's errors interdict its fact finding process, the manifest error standard is no longer applicable and, if the record is otherwise complete, the appellate court may make its own independent review of the record and decide the case. Jordon v. Intercontinental Bulktank Corp., 621 So.2d 1141 (La.App. 1st Cir.1993), writs denied 623 So.2d 1335, 1336 (La.1993).
The plaintiffs argue that the trial court's "scant" five page opinion fails to give adequate reasons for judgment and therefore negates application of the manifest error standard. We find this argument to be meritless.
The trial court adequately outlined the medical testimony and other facts presented at trial, upon which it relied in formulating its judgment. We do not find that the trial *932 court's reasons for judgment were so insufficient as to warrant a de novo review of the record. Further, we do not find that the trial court made errors which interdict its fact finding process, negating the application of the manifest error standard.
The plaintiffs further argue that the manifest error standard of review "does not apply in the review of trial depositions, of which there were several medical ones herein...." This position is legally incorrect.
In Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La.1987), the Louisiana Supreme Court made it clear that the manifest error standard of review does apply even when the evidence before the trier of fact consists solely of written reports, records and depositions. See also Richard v. Borden, Inc., 597 So.2d 60 (La.App. 1st Cir.1992).
The plaintiffs also assert that the manifest error standard of review does not apply in this case "because of the improper and possibly unethical actions of [the trial judge] himself." The plaintiffs cite no legal authority in support of this argument.
The record shows that after the trial court filed its written reasons for judgment, the plaintiffs sought to have the trial judge recused because his daughter had become employed by the defendant nursing home. Further, the judge's son-in-law was working for a bank which was founded by some of the same individuals who established the nursing home. The judge who presided at the recusal hearing found that the plaintiffs failed to establish grounds for recusal under LSA-C.C.P. Art. 151.
The plaintiffs then applied to this court for supervisory writs, seeking review of the denial of the recusal motion. Upon review, we found that, under LSA-C.C.P. Art. 151, the grounds for recusal are exclusive and not illustrative and that the plaintiffs failed to allege and prove any of the grounds for recusal listed under that article. The trial court decision denying the motion to recuse was affirmed. Therefore, the validity of the trial court's decision on the recusation issue has been previously ruled upon by this court. The plaintiffs are not entitled to have this issue again reviewed on appeal.
For the reasons set forth above, the plaintiffs' argument that the manifest error standard of review is not applicable to this case is without merit. We find that the applicable standard is indeed manifest error and we will review the record accordingly.

Manifest Error
This case is founded in tort. The elements of a cause of action in a tort suit, such as the present one, are fault, causation and damage. Pool v. Missouri Pacific Railroad Company, 541 So.2d 969 (La.App. 2d Cir.1989), writ denied 543 So.2d 10 (La.1989); Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App. 2d Cir.1984), writ denied 457 So.2d 14 (La.1984).
The plaintiff has the burden of proving every element of his cause of action and, in addition to proving tortious conduct, he must establish a causal link between the defendant's act or omission and the plaintiff's damages. Pool v. Missouri Pacific Railroad Company, supra.
In a tort suit, negligence is never presumed and the plaintiff bears the burden of establishing his claim to a legal certainty by a preponderance of the evidence. Mere possibilities and even unsupported probabilities are insufficient to support a judgment. Pool v. Missouri Pacific Railroad Company, supra.
By a preponderance of evidence is meant evidence which is of greater weight, or more convincing than that which is offered in opposition to it. It is evidence which, as a whole, shows that the fact or causation sought to be proved is more probable than not. Pool v. Missouri Pacific Railroad Company, supra.
The standard of care imposed on a nursing home is that of reasonable care, considering the patient's mental and physical condition. McGillivray v. Rapides Iberia Management Enterprises, 493 So.2d 819 (La. App. 2d Cir.1986); Cappo v. Alliance Insurance Company, 499 So.2d 233 (La.App. 2d *933 Cir.1986); Kildron v. Shady Oaks Nursing Home, 549 So.2d 395 (La.App. 2d Cir.1989).
A nursing home has no duty to furnish a nurse or attendant at all times. Oswald v. Rapides Iberia Management Company, supra; Cappo v. Alliance Insurance Company, supra.
While obligated to meet a high standard of care, a nursing home is not the insurer of the safety of its patients. Cappo v. Alliance Insurance Company, supra. Kildron v. Shady Oaks Nursing Home, supra.
Whether there was a breach of the duty of care owed to a nursing home patient is an issue of fact to be determined by the trier of fact. Lemoine v. Insurance Company of North America, 499 So.2d 1004 (La. App. 3rd Cir.1986), writ denied 501 So.2d 199 (La.1986).
In the absence of manifest error, a reviewing court should not disturb these factual determinations. In order to find manifest error, the record must support the conclusion that the factual determinations were clearly wrong. Oswald v. Rapides Iberia Management Enterprises, supra.
When findings of fact are based upon decisions regarding the credibility of witnesses, respect should be given to those conclusions, for only the fact finder can be aware of the variations in demeanor and tone of voice which bear so heavily on understanding and believing what is said. The reviewing court is mandated not to substitute its own evaluations and inferences for those of the trier of fact. Bolton v. Louisiana State University Medical Center, 601 So.2d 677 (La.App. 2d Cir.1992); Pereira v. Louisiana Coca-Cola Bottling Company, 620 So.2d 315 (La.App. 4th Cir.1993). When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990).
After weighing and evaluating medical testimony, the trial court may accept or reject the opinion expressed by the medical expert. The trial judge should evaluate the expert testimony by the same rules which are applicable to other witnesses and the trial court is not bound by expert testimony. Lloyd v. TG & Y Stores Company, 556 So.2d 629 (La.App. 2d Cir.1990).
The effect and weight to be given expert testimony is within the broad discretion of the trial judge. The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. Bolton v. Louisiana State University Medical Center, supra.
The testimony of a treating physician should be accorded more weight and probative value than that of a physician who has seen the injured party for purposes of rendering expert testimony concerning the party's condition. Pereira v. Louisiana Coca-Cola Bottling Company, supra.
In this case, nursing home personnel testified as well as the nursing home physician who initially treated Mrs. McDuff. The physicians who treated Mrs. McDuff during her hospitalization also testified. Dr. George M. McCormick, II, who performed the autopsy on the decedent also testified by deposition.
Mrs. McDuff was completely bed ridden and had only limited mobility. She was not able to turn in bed, but she could raise her hands to her face. Dr. Pankaj S. Shroff, the physician at the nursing home, testified that Mrs. McDuff had a history of duodenal ulcers and urinary tract infections. These urinary tract infections caused Mrs. McDuff to run high fevers and worsened her mental condition. She also experienced difficulty in swallowing. Dr. Shroff testified that Mrs. McDuff always had difficulty handling secretions and it was not unusual to suction mucus from her throat.
Helen Ainsworth and Barbara Brown were the nurse's aides on duty on the night of June 15, 1988. They testified that Mrs. McDuff was hallucinating and frequently had to be straightened because she had a tendency to slip down in the bed. They testified that they went into Mrs. McDuff's room at least once per hour during the night and at *934 no time did they observe her to be against the bed rail. They also testified that Mrs. McDuff could only move very slowly and was not capable of thrashing around in bed.
Mona Dortch, a registered nurse, Doris Hitt, a licensed practical nurse, and Joy Nugent, a nurse's aide, all employees of the nursing home, observed the bruise on Mrs. McDuff's neck on June 16, 1988. They testified that when originally observed, the bruise was the size of a dime and by the end of the day, had increased to the size of a fifty cent piece. Ms. Dortch testified that by 8 a.m. the next morning, the bruise had spread to the patient's chest area, but it had no definitive borders. Mrs. McDuff stated that she did not know what caused the bruise.
Dr. Shroff stated that he examined Mrs. McDuff on June 16, 1988, when the bruise was discovered, and monitored her throughout the day. He noted that the bruise was expanding, but was diffuse and was not demarcated.
Dr. Shroff stated that the next day, June 17, 1988, Mrs. McDuff's fever rose and he determined that she was suffering from a urinary tract infection. She had some difficulty in swallowing, but she was not having any difficulty breathing. She was admitted to Citizen's Medical Center and was given intravenous fluids and antibiotics. A nasal-gastric tube was put in place to provide her with fluids. Dr. Shroff, who continued to treat Mrs. McDuff, testified that he admitted Mrs. McDuff to the hospital and was treating her for a urinary tract infection, not the bruise. He noted that by June 18, 1988, the bruise had spread to the back of her neck, but there was still no demarcation.
On June 19, 1988, while in Citizen's Medical Center, Mrs. McDuff developed respiratory difficulty and was intubated to help her breathe. On that date, Dr. Shroff transferred Mrs. McDuff to Glenwood Medical Center for consultation with Dr. Henry G. Taliaferro, Jr., an otolaryngologist, or "ENT" specialist. Dr. Shroff did not believe the bruise caused the breathing difficulty, but thought it necessary to send Mrs. McDuff to Dr. Taliaferro for a consultation.
Dr. Shroff stressed in his testimony that Mrs. McDuff did not develop respiratory difficulty until three days after the bruise was discovered. He testified that Mrs. McDuff was not bruised by a bed rail. He further stated that if the bed rail caused the bruise, there would have been swelling, pain and tenderness in the area of contact.
Dr. Taliaferro testified that Mrs. McDuff was admitted to Glenwood Medical Center due to respiratory distress. He stated that there was no trauma to the patient's larynx. Massive trauma was ruled out by diagnostic testing. He stated, that the patient's respiratory distress was caused by her inability to handle her secretions.
While a patient at Glenwood Medical Center, Mrs. McDuff experienced a perforated duodenal ulcer. Dr. R.T. Lolley performed surgery to remedy this condition. Dr. Lolley testified that Mrs. McDuff tolerated the surgery well, but in his opinion she died due to respiratory insufficiency. He stated that it is not unusual in patients with overwhelming infections to have respiratory problems requiring intubation. Dr. Lolley testified that in his opinion, he could not connect the bruise on Mrs. McDuff's neck directly with her death.
Dr. Ronald Hammet, an expert in pulmonary medicine, testified on behalf of the plaintiffs. His testimony was internally inconsistent and was somewhat inconsistent with the other testimony offered in this case. He testified that Mrs. McDuff was transferred to Glenwood Medical Center because of a compromise of her airway caused by the bruise. No other medical expert in this case testified that the patient's airway was compromised. Dr. Hammet also testified that Dr. Shroff accompanied Mrs. McDuff when she was transferred to Glenwood Medical Center. Dr. Shroff denies that he accompanied the patient to Glenwood or that he spoke with Dr. Hammet.
At one point Dr. Hammet stated the patient's pulmonary condition was not related to the bruise and stated that the bruise had nothing to do with Mrs. McDuff's death. However, Dr. Hammet later stated that, in his opinion, the bruise did not kill the patient, "but it played a role in the whole thing."
*935 Regarding his treatment of Mrs. McDuff during her hospitalization at Glenwood, Dr. Hammet noted that the patient, who had been intubated at Citizen's Medical Center, improved after her transfer to Glenwood Medical Center. On June 21, 1988, the tube was removed and Mrs. McDuff was able to breathe satisfactorily. Dr. Hammet stated that the tube was put back in place for the ulcer surgery on June 22, 1988. At some point after the surgery, the tube was again removed, but Mrs. McDuff was not able to handle her secretions and the tube was once again put back in place. Dr. Hammet stated that at this point, Mrs. McDuff's family declined to have her placed on a respirator and eventually she expired on July 2, 1988.
Dr. George M. McCormick, II, performed an autopsy on the decedent on July 2, 1988, the date of her death. The autopsy report lists the cause of death as chronic respiratory failure. Prior to performing the autopsy, Dr. McCormick was informed that there was some question as to whether bed rails had caused the bruising on the decedent. Dr. McCormick originally stated that the probable cause of the bruise was a bleeding disorder. It was noted that the bleeding was not deep, and that there was no internal trauma to the neck and the airway was not compromised by the bruise.
Dr. McCormick was later engaged as an expert witness by the plaintiffs and was shown pictures of the bruises taken while Mrs. McDuff was hospitalized. After having been hired by the plaintiffs and viewing the photographs, Dr. McCormick altered his view regarding the bruising and the patient's ultimate demise. He opined that Mrs. McDuff somehow came in contact with the bed rails and most probably had her head through the rails of the bed and remained in that position for at least one hour. He contended that this pressure damaged the vessels in the patient's neck and chest, resulting in the bruising. He further stated that the small bruise appeared in the center of the neck and spread because the vessels in the center of the neck were the most severely damaged.
Dr. McCormick stated that the bruising was not sufficient to have caused death by itself. However, he felt that the bruising and the patient's hospitalization, first in Columbia and then in Monroe, caused great stress which contributed to the perforation of the duodenal ulcer, the resulting respiratory distress and ultimately Mrs. McDuff's death.
Dr. Ran Phillips was called by the defendant as an expert in internal medicine. Dr. Phillips examined Mrs. McDuff's medical records as well as the bed she occupied at Columbia Heights Nursing Home. He stated that in order for the bruising on Mrs. McDuff's neck to be caused by contact with the bed rail, it would have taken at least two persons to position Mrs. McDuff against the bed rail. He also stated that if Mrs. McDuff had been against the bed rail for more than one hour, the initial bruise would have been much larger than that originally observed by the nursing home personnel. He also testified that with a contact bruise, the shape of the bruise will conform to the shape of whatever is contacting it.
Dr. Phillips testified that he believed the large bruise was caused by multiple subcutaneous bleeding, possibly caused by the infection. In support of his view that the bruise was the result of spontaneous subcutaneous bleeding, he noted that in the photographs of the bruise taken in the hospital, there were numerous points in the bruised area which were clear. He also noted that Mrs. McDuff had numerous other bruises on her arms. He found these factors to be consistent with spontaneous subcutaneous bleeding, rather than finding the bruise to have been induced by trauma or pressure. He further stated that the bruise had no connection with Mrs. McDuff's respiratory distress.
After reviewing the entire record in this case, we do not find that the trial court was manifestly erroneous in rejecting the plaintiff's claims. The issue of whether the defendant was negligent in allowing Mrs. McDuff to become bruised and whether the bruise ultimately led to her death is a factual question. Based upon the medical and lay testimony in this case, the trial court did not err in concluding that the plaintiffs failed to establish that the bruise was caused by the negligence of the defendant or that the bruise was related to the death.
*936 The personnel at the nursing home testified that, prior to the appearance of the bruise, Mrs. McDuff was checked hourly and was never observed to be in contact with the bed rails.
The medical evidence and testimony do not show that this bruise was caused by anything other than spontaneous subcutaneous bleeding as described by Dr. Phillips. No medical expert testified that the bruising caused any compression of the patient's airway or contributed to the respiratory distress which ultimately claimed Mrs. McDuff's life.
Only Dr. McCormick opined that the bruising set in motion a cycle of stress and hospitalization for this patient which ultimately resulted in her perforated ulcer, respiratory distress and death.
The plaintiffs argue that the opinions of all experts in this case should be disregarded, with the exception of the opinion of Dr. McCormick. The jurisprudence is clear that the trial court has discretion to accept or reject in whole or in part the testimony of any witness. Based upon our review of this record, we find that the trial court did not err in its evaluation of the expert testimony, nor did it err in concluding that the plaintiffs failed to prove that the nursing home breached its duty of care in this case.

RES IPSA LOQUITUR
The plaintiffs argue that under the doctrine of res ipsa loquitur, it is clear that the nursing home was at fault in the bruising and ultimate death of Mrs. McDuff.
Res ipsa loquitur is a rule of circumstantial evidence. The rule applies when the facts suggest that the negligence of the defendant is the most plausible explanation of the injury. Thus, it is normally determined at the conclusion of the trial. Culver v. Ochsner Foundation Hospital, 474 So.2d 984 (La.App. 5th Cir.1985), writ denied 477 So.2d 705 (La.1985); Hollier v. Lay Down Service, Inc., 554 So.2d 746 (La.App. 3rd Cir.1989); Pool v. Missouri Pacific Railroad Company, supra.
This evidentiary doctrine is applicable where the defendant has the actual control of the agency, instrumentality of conditions which cause the plaintiff's injury; the evidence as to the true cause of the plaintiff's loss is more readily accessible to the defendant than to the plaintiff; and the accident is of the kind that does not occur in the absence of negligence and/or the circumstances attending the accident create an inference of negligence on the part of the defendant. Morgan v. Willis Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984); Culver v. Ochsner Foundation Hospital, supra.
It should be noted that the doctrine of res ipsa loquitur does not dispense with the requirement that the plaintiff prove negligence by a preponderance of the evidence. A plaintiff relying on res ipsa loquitur must prove circumstances which create an inference of negligence on the part of the defendant. Morgan v. Willis Knighton Medical Center, supra.
In this case, the doctrine of res ipsa loquitur does not apply. As stated earlier, the doctrine applies when the facts suggest that the negligence of the defendant is the most plausible explanation of the injury. The plaintiffs have failed to show that the negligence of the nursing home was the most plausible explanation for the bruise. Further, the plaintiffs failed to carry their burden of proving that the bruise resulted in Mrs. McDuff's death. The medical testimony in this case largely supports the theory that Mrs. McDuff's bruise was the result of spontaneous subcutaneous bleeding. The majority of the medical testimony in this case was also to the effect that the bruise did not cause Mrs. McDuff's death. Further, the plaintiffs did not establish that Mrs. McDuff ever came in contact with the rails of her bed. Nursing home personnel testified that the night before the bruise was discovered, the patient was checked at least once per hour and was never observed to be against the bed rails. Further, Mrs. McDuff had a special buzzer to summon assistance should the need arise. There was no showing that she requested aid during the night. Also, Mrs. McDuff reported that she did not know how she got the bruise. Therefore the doctrine *937 of res ipsa loquitur does not apply to this case.

CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court, in favor of the defendant, Columbia Heights Nursing Home, and rejecting the claims of the plaintiffs, Betty Ann McDuff McCartney, James P. McDuff, Madge Drew McDuff James, Merle McDuff Simon and Peggy McDuff Smith. Costs are assessed to the appellants.
AFFIRMED.