DALEY, Judge.
Plaintiff, Ruston Zeller, appeals the trial court’s finding that one defendant, Heyl & Patterson, has no liability in the accident that injured Mr. Zeller.[1] After thorough consideration of the record and pertinent law, we affirm.
Mr. Zeller was injured in the course and scope of his employment as a bargeman[2] at the Zen-noh Grain Corporation elevator and barge unloading facility in Convent, Louisiana, on October 10, 1990. Plaintiffs injuries occurred when a chain in the barge haul system snagged a barge kevel, creating tension on and causing a wire cable in the barge haul system to break and strike plaintiff. Originally, plaintiff filed suit against forty-eight different corporate and individual defendants; trial proceeded against five defendants: Zen-noh Grain Corporation, Olympic Marine |4Company (owner/operator of the tugboat that moved the barge), Joseph Tardo (captain of the tugboat), Alton Rivero (port director for Olympic Marine), and Heyl & Patterson (designer of the barge haul system).
Fidelity & Casualty Company of New York, as workers’ compensation carrier, intervened in the suit for recovery of its payments to plaintiff. After a lengthy bench trial on August 23-27, 1993, the trial court rendered the following verdict: $400,000 past, present, and future pain and suffering to Zeller; $149,573.16 past medical expenses; $64,551.75 future medical expenses; $76,-793.11 past lost wages; and $224,335.98 for future wage loss. Mrs. Zeller was awarded $25,000 for loss of consortium. The trial court made the following apportionment of liability: 70% fault to Zen-noh employees, 25% contributory negligence to plaintiff, and 5% fault to Olympic Marine. The trial court found that the actions of Heyl & Patterson, as manufacturer of the barge haul system on which plaintiff worked, had no causal relationship to the plaintiffs accident. The in-tervenor’s lien in the amount of $249,865.99 was recognized, with the judgment providing for the additional reimbursement of any additional sums paid. Plaintiffs’ claims against Zen-noh Corporation, Tardo, Rivero, and Heyl & Patterson were dismissed with prejudice.
Plaintiffs filed a Motion for New Trial. Olympic Marine, Tardo, and Rivero filed a Motion for Reargument and/or Reconsideration and/or New Trial. The trial court granted a new trial for reargument purposes only and agreed to consider additional testimony. The court heard reargument, the testimony of an additional witness, and received several proffered depositions on April 6,1995.
On July 24, 1995, plaintiffs dismissed their claims against Olympic Marine, Tardo, Rive-ro, and various other insurers and underwriters, with prejudice, reserving their rights against Heyl & Patterson.
|sOn August 21,1996, the trial court denied plaintiffs’ Motion for New Trial with regard to their claims against Heyl & Patterson. Plaintiffs and intervenor moved for a devolu-tive appeal.
On appeal, the Zellers assert various assignments of error. First, they argue that admiralty substantive law, specifically the general maritime law of products liability, applies to this case, rather than the Louisi *1174 ana Products Liability Act, LSA-R.S. 9:2800.51 et seq. Next, a series of assignments of error challenges the trial court’s finding that no causal connection linked the actions of Heyl & Patterson with the plaintiffs accident. Specifically, the plaintiff argues that the barge haul system was defective because Heyl & Patterson failed to provide the proper specifications and warnings. Plaintiff argues that the trial court committed legal error in failing to adopt the uncontradieted opinion of plaintiffs expert, Mr. AJ. McPhate. Finally, plaintiffs contend that the trial court’s awards of loss of future earning capacity, loss of future earnings, and future medical expenses were inadequate and should be raised, and that the trial court erred in failing to award plaintiff damages for lost fringe benefits.
We affirm the trial court’s finding that Heyl & Patterson is not liable to plaintiff for this accident. The assignments of error relating to plaintiffs contributory fault and quantum are rendered moot by our affir-mance of the trial court’s judgment, and plaintiffs’ dismissal of the remaining defendants Olympic Marine, Tardo, and Rivero.

Facts

Ruston Zeller had been employed as a bargeman since November 1982 at Zen-noh’s Convent grain elevator. Zeller worked at the barge unloading slip, where | (¡loaded inland river hopper barges would be unloaded and their cargo transferred to ocean-going vessels. In 1980, Zen-noh began the construction of its barge unloading facility at its Convent grain elevator. R.S. Fling & Partners, Inc., consulting engineers (Fling), were responsible for the overall coordination of the project. James Bleke and Associates were employed as the on-site construction managers. Bleke did not have any involvement in the design of the barge haul system. Fling furnished the barge haul design specifications to Heyl & Patterson. These specifications did not include the tag line (the cable which broke) or tag line hoist, as these were to be furnished by Zen-noh. Heyl & Patterson’s equipment was installed and erected by B & G Crane/Sun Erection. Heyl & Patterson had a representative present on the site during erection and start up.
The barge haul system was designed by Heyl & Patterson, save specific parts, such as the tag line and tag line hoist, that Zen-noh furnished. The barge haul system is an integrated system of cables and chains that allow a loaded grain barge to enter the slip, have its covers removed and cargo unloaded, cleaned and covers replaced, and the empty barge moved through the slip to be removed by a tug boat. Four bargemen, one of whom was Zeller, are responsible for hooking the barge to the barge haul system and removing it once the barge is unloaded.
Zen-noh’s barge unloading facility consists of three primary components. The “heart” of the facility is the “barge haul system,” a dual winch system consisting of large cables. At each end of the slip is a large winch, from which a barge haul cable leads towards the center of the slip where it is attached to the barge. The upriver cable is manually attached by Zen-noh bargemen to the upriver end of the barge and likewise, the downriver cable is attached to the downriver end of the barge. These two barge haul cables allow the operator, who sits in the cover station control room, |7to move the barge back and forth within the slip so that the covers can be removed, the barge unloaded, and then refitted with its covers. The second component, the cover station, is located at the downriver end of the barge slip; there the barge is first moored, its covers are lifted and removed. The barge is then moved towards the upriver end of the slip where it is unloaded; it is then shifted back downriver, underneath the cover station, where the barge covers are lowered and refitted onto the empty barge. The third component is the “marine leg un-loader,” which is situated towards the upriver end of the barge slip. Here a bucket unload-er scoops grain from the barge and transfers the grain into the conveyor/shiploading system.
The upriver and downriver barge haul cables are the primary components in the barge haul system, and are connected with two 200-foot tag lines. These tag lines were not supplied by Heyl & Patterson, but were furnished by Zen-noh. The tag lines prevent the cables from falling into the river; the tag lines are also used, along with a hoist, by *1175 Zen-noh personnel to raise or lower the cables on and off each barge. It was this tag line that snapped and stuck Zeller after the chains on the end of the upriver cable snagged on the barge kevel.
On October 10, 1990, the dock personnel were moving what they remember as the second barge of the shift through the slip. Zeller’s position at that time was on the stem of the empty barge, the last man to get off the barge before it leaves the slip. Zeller had released the breast line, which is a “soft” line as opposed to a cable or chain, that connected the empty barge to the fender system in the slip. He walked down the length of the barge to the catwalk’s ladder, where he was supposed to get off the empty barge. At this point, the upriver chain became hooked on a kevel (a raised portion of the barge deck for anchoring purposes) and snagged the barge, creating tension on the tag line. This snapped, hitting Zeller as he was reaching for |8the ladder and knocking him into the river. Zeller sustained severe injuries to his left arm, including broken bones, severe soft tissue loss, and avulsion injuries to the nerves in his arm.

Analysis

The trial court found that the actions of Heyl & Patterson, the designers of the barge haul system, had no causal connection to the plaintiffs accident. Plaintiffs’ first assignment of error concerns the choice of law, specifically general maritime law or state law, under which these questions must be decided. They argue that state products liability law should not be applied in this case.
We find that the application of state law in this case is clearly authorized. In Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), our Supreme Court held that the federal admiralty law scheme authorized the application of state law in a state court admiralty case when the state’s interest in the matter is greater than the federal interest in uniformity. This state interest is greater, the Green court found, when the cause of action is a maritime tort rather than a maritime contract; the federal interest in uniformity is minimal because of the fortuitous nature of accidental injuries and the strong state interest in providing redress for injuries.
Finding an exact counterpart in the state law to the federal law is not required; the pertinent inquiry is whether application of the state law “thwarts the purpose” of any specific Congressional pronouncement, or “work[s] material prejudice to the characteristic features of maritime law or interfere[s] with the proper harmony or uniformity of that law in its international and interstate relations”. Green at p. 639, quoting Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921); Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).
1¡¡However, in this particular case, under both general maritime law and the Louisiana Products Liability Act, we find that the outcome of the case would be the same. Under both bodies of law, there is no duty for a manufacturer to warn a user of a product of open and obvious dangers. Pavlides v. Galveston Yacht Basin, Inc., 727 F.2d 330 (5th Cir.1984); Delphen v. Dept. Of Transp. & Dev., 94-1261 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, writ denied 95-2116 (La.11/17/95), 663 So.2d 716, writ denied 95-2124 (La.11/17/95), 663 So.2d 717.
Many witnesses, Marty Sibley (cover station operator), Byron Parker (deckhand on M/V JUDITH ANN), Larry Keeley (cover station operator), and both Zen-noh personnel and plaintiff himself, testified that it was a known danger that a chain on the cable could get caught on a barge kevel, and that this situation was a regular topic of safety meetings. At trial, much testimony centered around two different methods used by the operators in moving the cables. One group lifted the chains high above the deck of the barge; another group lowered the chains between the barge and the fender system. Much testimony was devoted to whether the “lift” method was in fact safer than the “lower” method, but it was never conclusively established that one method was safer than the other, or that the method employed, the “lower” method, was a cause of the chain becoming hooked on the kevel. Marty Sib-ley, the cover station operator at the time, said that five seconds before the accident he *1176 saw the chains positioned below the deck of the barge, exactly where he had placed them, about 5 feet in front of the bow. He does not know how the chain moved and became caught. None of the Zen-noh witnesses or Olympic Marine witnesses could identify how the chain became caught. Zen-noh operators have continued to use both methods since the accident, and reported no further accidents.
| ioJames Wallaert, the Heyl & Patterson representative who testified via deposition, said that the system that Zen-noh purchased was a standard two slip barge haul system. Heyl & Patterson provided four barge haul engines (two on each side), the wire rope, the pulleys, and cable loops on the end of each wire rope (cable). Heyl & Patterson did not supply the tag line or the tag line hoist. H & P supplied electrical equipment to control the parts they supplied, but they did not supply a console or other electrical equipment to control the tag line. The evidence shows that Zen-noh made subsequent material alterations to the barge haul system after it was installed and accepted. Originally, the barge haul cables ended in wire loops that were to be placed over the barge kevels; Zen-noh’s maintenance supervisor, Drexel Sehexnay-dre, changed these wire loops to chains. No one at Zen-noh ever spoke to Heyl & Patterson regarding the rearrangement of the wire loops to chains.
Heyl & Patterson supplied an operating instructions manual to Zen-noh, and a maintenance manual.
Zen-noh also used tugboats to push the unloaded barges through the system, a procedure not contemplated by Heyl & Patterson. Jan Ellzey of Fling testified in deposition that the barge haul system was not designed for tugboats to be used for pushing the barges through the system. His opinion was shared by other witnesses, including Wallaert. The system was designed for barge movement to happen when the barge is attached to the system; this way, there is never a loose chain or cable that can acci-dently snag the barge, because all the cables are connected. When the tugboat is used to push the empty barge through, that barge is not connected to the barge haul system, and hence unconnected cables are present that could (and did) snag the barge.
InBoth plaintiff’s and Heyl & Patterson’s experts testified that the wire loops were probably safer than the chains and less likely to snag on the kevels. Wallaert and other witnesses to the start up testified that they did not see the hoist at the start up, nor the chains, nor did the procedure at the start up use the tugboats to push the unloaded barges.
Plaintiff argues that Heyl & Patterson should have provided specifications for the tag line because H & P designed the system into which the tag line would be integrated. However, Heyl & Patterson testified that they were not asked to furnish the specifications for the tag line. We find that under these circumstances, Heyl & Patterson did not have a duty to furnish specifications for this part. Plaintiff also argues that Heyl & Patterson should have foreseen the modifications that Zen-noh made to the system and forewarned against those changes. However, we find no such duty under the law. Plaintiffs cite Bloxom v. Bloxom, 512 So.2d 839 (La.1987). In Bloxom, supra, the Supreme Court defined a manufacturer’s duty:
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user ... In the context of a manufacturer’s duty to warn of the dangers in the use of a product, the manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. [Citations omitted.] 512 So.2d at 843.
The duty to anticipate and provide warnings for “foreseeable use and misuse” does not include a duty for the manufacturer to anticipate and warn a user against every conceivable alteration a user may make to a product. Heyl & Patterson’s representative witnessed the start up of the operation, at which point none of the alterations in the design or procedure had been made. Moreover, as mentioned above, the evidence clearly established that the dangers of the chains snagging the *1177 barges was an open and obvious one, known to Zen-noh and its employees.
|12In their next assignment of error, plaintiffs argue that the trial court committed legal error in failing to adopt the uncontra-dicted opinion of plaintiffs expert, Mr. A.J. McPhate.
The effect and weight to be given expert testimony is within the broad discretion of the trial judge. McCartney v. Columbia Heights Nursing Home, Inc., 25,710 (La.App. 2 Cir. 3/30/94), 634 So.2d 927. While it may not be lightly disregarded, even uneon-tradicted expert testimony is not binding on the court. Sanders v. Wysocki, 92-1190 (La.App. 4 Cir. 1/27/94), 631 So.2d 1330.
There is no indication that the trial judge “lightly disregarded” the plaintiffs expert’s opinions and testimony. Moreover, McPhate agreed that the Zen-noh personnel, who operated the system every day, were well aware of the hazards associated with the barge haul system. We find no merit to this assignment of error.
Because of our finding that Heyl & Patterson is not liable for this accident, and due to the plaintiffs’ post-trial settlement and dismissal of the remaining defendants with prejudice, we find that the remaining issues of plaintiffs contributory negligence and the amounts of his damage awards are moot because no viable defendants remain. Even if we were to analyze these issues, plaintiffs have settled with the other defendants, and any hypothetical reapportionment of plaintiffs fault or change in the amount of his damage awards would be without practical effect.
Accordingly, we affirm the judgment of the trial court. All costs of this appeal are taxed to appellant.
AFFIRMED.

. Theresa Rogers Zeller, Ruston’s wife, was also a plaintiff, having asserted a loss of consortium claim.

. Mr. Zeller was classified as a longshoreman under 33 U.S.C. § 901 et seq., the Longshore and Harbor Worker's Compensation Act.