840 So.2d 1281 (2003)
Sister Carol FRANCIS, Individually, and on Behalf of Her Father, Jacob Francis, Sr.
v.
LAFON NURSING HOME OF the HOLY FAMILY and Sisters of the Holy Family.
No. 2002-CA-1863.
Court of Appeal of Louisiana, Fourth Circuit.
March 19, 2003.
Rehearing Denied April 15, 2003.
*1282 D. Briana Rivera, Law Office of D. Briana Rivera, San Diego, CA, and Jack W. Harang, Smith & Harang, Mandeville, LA, for Plaintiff/Appellant.
Richard A. Bordelon, Ralph J. Aucoin, Denechaud & Denechaud, New Orleans, LA, for Defendant/Appellee.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge PATRICIA RIVET MURRAY and Judge MICHAEL E. KIRBY).
WILLIAM H. BYRNES III, Chief Judge.
On February 7, 1994, plaintiff-appellant, Sister Carol Francis, individually and on behalf of her father, Jacob Francis, Sr. sued the defendants, Lafon Nursing Home of the Holy Family (Lafon) and the Sisters of the Holy Family[1] (Sisters) claiming that Mr. Jacob was "mistreated, neglected and inappropriately discharged and his care was not provided adequately."
On January 11, 2002, Sister Carol Francis filed an amended petition noting that she "was duly appointed administrator of the Estate of Jacob Francis ..." This amended petition alleged claims founded in breach of contract, negligence, breach of fiduciary duty, damages and attorney's fees under La. R.S. 40:2010.9, and violation of the Louisiana Unfair Trade Practices and Consumer Protection Act, La. R.S. 51:1401, et seq.
Pursuant to the defendant's motion for summary judgment, on February 8, 2002, the trial court rendered a judgment dismissing the defendant, Lafon Nursing Home, from the case.
On February 14, 2002, the trial court issued a revised judgment dismissing the other defendant, the Congregation of the Sisters of the Holy Family, for the reason that the failure of the original judgment to do so was inadvertent and there was no reason not to grant the judgment in favor of the Congregation of the Sisters of the Holy Family as well as Lafon Nursing Home.
The trial court provided no written reasons supporting the merits of its decision to dismiss either of these defendants.
Appellate courts review summary judgment de novo, using the same criteria applied by the trial courts to determine whether the summary judgment is appropriate. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/2000), 755 So.2d 226, 230. The supporting documentation submitted by the parties should be scrutinized equally, and there is no longer any overriding presumption in favor of trial on the merits. Id., 755 So.2d at 231; Johnson v. State/University Hosp, 01-1972, p. 5 (La.App. 4 Cir. 1/16/02), 807 So.2d 367, 369.
Essentially, plaintiff's claim is one for the mental distress her father endured as a result of being moved from Lafon to strange surroundings in a new facility, Easthaven Care Center (Easthaven), although her petition also included allegations that Mr. Francis was assaulted at the new facility.
A nursing home is not a resident's insurer. McCartney v. Columbia Heights *1283 Nursing Home, Inc., 25,710 (La.App. 2 Cir. 3/30/94), 634 So.2d 927, 933.
The plaintiff's case is founded in the defendants' breach of duties arising from the following statutes and federal and state regulations: Plaintiff cites C.F.R. § 431.220(3) in support of the contention that Mr. Francis was entitled to a hearing when "he or she believes a skilled nursing facility or nursing facility has erroneously determined that he or she must be transferred or discharged." Plaintiff cites C.F.R. § 483.12 in support of the contention that: (1) Mr. Francis and a family member were entitled to be notified in writing of his discharge and transfer; (2) Mr. Francis and a family member should have been notified of his right to appeal the discharge and transfer; (3) Mr. Francis and a family member should have been given notice of the name, address and telephone number of the State long term care ombudsman; (4) and Mr. Francis and a family member should have been notified concerning Lafon's bed-hold policy. These same requirements can be found in the State of Louisiana Department of Health and Human Resources "Standards For PaymentSNF/ICF." In addition to general tort law, La. R.S. 40:2010.9 specifically provides nursing home residents with a private cause of action for damages.
To be actionable the defendant(s)'s conduct must be both the cause-in-fact and a legal cause of the plaintiff's damages. Succession of Harvey, 97-2815, p. 4 (La.App. 4 Cir.1998), 716 So.2d 911, 914. Conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm, i.e., but for the defendant(s)'s conduct, the plaintiff would not have sustained the injury. Id. In other words, it is not enough for the plaintiff to prove tortious conduct on the part of the defendant(s); the plaintiff has the burden of establishing a causal connection between the defendant(s)'s act or omission and the plaintiff's damages.
It is undisputed that Lafon did not give Mr. Francis or a family member written notice of intent to discharge him, including the reasons for the discharge, the date of discharge, his right of appeal, Lafon's bed-hold policy and contact information for the State long term care ombudsman. The defendants in their motion for summary judgment and on this appeal have not challenged the plaintiff's reading of these state and federal regulations. Rather, the defendants contend that Mr. Francis required skilled care which Lafon could not provide.
From this, the defendants argue that even if the plaintiff is able to prove that Lafon failed to comply with all of the above cited state and federal regulations, i.e., Lafon breached one or more duties to Mr. Francis, the breach of that duty or duties was not the cause of Mr. Francis' alleged damages because, even had Lafon done all of the things the plaintiff contends Lafon should have done, Mr. Francis' need for skilled care would have necessitated his discharge from Lafon and transfer to Easthaven that occurred in this case. Therefore, any distress Mr. Francis may have suffered as a result of his discharge and transfer was the inevitable consequence of his condition and could not have been prevented by compliance with regulatory notice requirements and appeal procedures, etc.
The defendants explained this argument in their brief:
On February 15, 1993, after Mr. Francis had been discharged by University Hospital and transferred by University Hospital to its skilled nursing facility, Lafon noted in its record that Mr. Francis had been discharged to his family because of this reclassification as being in need of skilled care.... It was not Lafon's decision *1284 to transfer Mr. Francis to a skilled nursing home. That determination was made by University Hospital and was not Lafon's decision to question. It is undisputed that Mr. Francis was discharged by University Hospital to a skilled nursing facility. Since Lafon is not a skilled nursing facility, Mr. Francis could not return to Lafon. Lafon did not make the determination that Mr. Francis required skilled care. That was a decision made by University Hospital. There was no decision made by Lafon which Mr. Francis or his family could appeal. The decision was made by University Hospital.
University Hospital subsequently transferred Mr. Francis into another nursing home [Easthaven]. Lafon again had no part in that decision. [Emphasis added.]
* * *
[A]ny alleged breach of the alleged notification requirements are not casually connected to the damage claims of the appellant. In other words, it is undisputed that it was not Lafon that caused or determined that Mr. Francis needed skilled care. It was not Lafon that transferred Mr. Francis to a skilled nursing facility on February 9, 1993. It was not Lafon that discharged Mr. Francis from that skilled nursing facility into yet another facility on March 3, 1993.[2] Any written notification to appellant would not have changed the undisputed facts that it was determined by Mr. Francis' independent health care providers that he needed skilled care and that Lafon was not a skilled care nursing home. Any failure in notification is of no consequence and does not support the claims for damages alleged by appellant, whether based in negligence, breach of contract or otherwise.
In other words, Lafon contends that if Lafon did not provide the type of health care services Mr. Francis required at the time of his discharge and had no duty to provide that type of health care services, then Lafon's failure to meet some bureaucratic notice and procedural requirements was not a cause of any of the damages that the plaintiff claims in this suit. However, the defendants' contention that, "Lafon again had no part in that decision," referring to Mr. Francis' transfer by University Hospital from its skilled care facility to Easthaven, is not quite true. What the defendants fail to mention is that there is evidence in the record supporting a finding that one of the reasons that the independent health care providers transferred Mr. Francis to the East Haven nursing home is that Lafon refused to take him back, which implies that the decision of Mr. Francis' "independent health care providers" to transfer him elsewhere may have been influenced by more than just the level of health care that Lafon could or should have provided. Dr. Kumar's deposition testimony and the medical records he discussed indicate that while Lafon may not have directed University Hospital to send Mr. Francis first to University Hospital's skilled care facility and then to Easthaven, both of those decisions were significantly impacted by Lafon's indication that Mr. Francis should not be returned to its facility. Lafon concedes in its brief that Lafon's records note that on February 15, 1993, Mr. Francis was, "Discharged to Family reclassified as skilled." Lafon does not contest the fact that at the time *1285 of his discharge, Mr. Francis was paid through the end of the month.[3] The issue then becomes one of whether Lafon could or should have provided the types of health care services required by Mr. Francis.
The defendants' argument that Mr. Francis required skilled care which they could not provide is founded on the document annexed to their motion for summary judgment indicating that Mr. Francis had a need for "heparin monitoring, oxygen, and aerosol[4] treatment and monitoring."
The plaintiff points out that Mr. Francis no longer required heparin after February 16, 1993. Therefore, the reimbursement certifications signed between February 16, 1993 and March 3, 1993, which are based in part on Mr. Francis' heparin needs, are not based on accurate information. To counter the defendants' argument that regardless of the cessation of Mr. Francis' need for heparin he still needed skilled care for the administration of oxygen and aerosol treatments, the plaintiff contends that the administration of oxygen and aerosol treatments required skilled care only at the outset. Plaintiff cites 42 C.F.R. § 409.33(d)(10) in support of the proposition that "routine administration of medical gases after a regime of therapy has been established" is considered a personal care service which does not require the skills of qualified technical or professional personnel.
The deposition of Dr. Prem Kumar, offered by the defendants in support of their motion for summary judgment, supports the plaintiff's argument that even if Mr. Francis required skilled care services initially, such a requirement could have been of short duration. Dr. Kumar was one of Mr. Francis' treating physicians at University Hospital. Dr. Kumar noted from the hospital medical records that:
Case was discussed with social workers, who stated the patient was unable to receive nebulizer treatments in the Lafon Nursing Home. [Emphasis added.]
* * *
The patient was felt to require nebulizer breathing treatments via face mask due to his inability to cooperative [sic] with portable aerosol treatments.
The patient was transferred to skilled nursing facility for nebulizer treatments and placement in appropriate skilled nursing home.
* * *
As best as I can rememberand this is all from recollectionI don't think they [Lafon] were giving the nebulizer treatments.
Dr. Kumar explained that many patients administer the nebulizer treatments to themselves or have family members do it. Dr. Kumar testified that, "It's very simple." Dr. Kumar was questioned further on this matter:
Q. You had mentioned earlier that you thought that Lafon did not take residents who needed nebulizer treatments. Is that your understanding?
A. That is just my recollection. But this is a simple treatment, and even, like I said, patients and their families can deliver the treatment at home. But as *1286 best as I can recall, Lafon did not deliver that treatment.
* * *
But in this particular instance, I think the patient was sent to a skilled care facility at University itself. And perhaps one of the reasons was that Lafon may have said that they would not be able to deliver that treatment. [Emphasis added.]
* * *
Like I said, many of our asthmatic patients and patients with chronic obstructive lung disease who do require these treatments can do it at home themselves, and their family members can be trained to do it. So that being the case, I would assume that any nurse can be trained in doing that.
* * *
Frankly speaking, I don't think you need really very high skills to be able to deliver that treatment. If the patient can do it at home and the families can do it at home, surely, it can be done in any facility. [Emphasis added.]
Dr. Kumar went on to testify that Mr. Francis was discharged from University Hospital with the notation that, "The chronic obstructive pulmonary disease resolved with residual hypoxia requiring home oxygen." Dr. Kumar explained that by hypoxia he meant that Mr. Francis' oxygenation was poor, and that "even in the skilled nursing facility, his arterial blood gases were abnormal." Mr. Francis' hospital discharge indicates, "O2 two liters per nasal cannula." Dr. Kumar testified that, as in the case of the nebulizer, a competent patient could administer the oxygen to himself or have it administered to him in his home by a home care nurse who usually just set the level of the oxygen which the patient then administered to himself. According to Dr. Kumar, even with Mr. Francis' limitations all he would have to do would be "to stick it in his nose to use it by nasal cannula." In fact, Dr. Kumar testified that:
At home, many of the patients get home oxygen like they do in the nursing homes, the only thing is that the nurses visit periodically to ensure that the patient is getting appropriate oxygen through the appropriate delivery system that he needs.
At the time of discharge, Mr. Francis was in need of continuous oxygen. Dr. Kumar did not know if the applicable laws and regulations for an intermediate care nursing facility would allow for continuous oxygen treatments but:
I do know, though, from my past recollection that if a patient required oxygen that we would generally be told that the patient may have to go to a skilled facility.
When asked why, Dr. Kumar explained that:
Well, basically, we were told that this is something that an intermediate care facility doesn't do.
Moreover, the patient's arterial blood gases would have to be monitored periodically, which would be done by drawing arterial blood samples. Dr. Kumar testified that the drawing of arterial blood samples requires "real skill" and must be done by people who are well trained in drawing arterial samples, unlike the drawing of venous blood which "is very simple." He would expect such skills to be found in a skilled nursing facility. It requires a registered nurse. Dr. Kumar added that skilled facilities are normally fairly close to the acute care hospital which is important because "the measurements are to be done in a certified laboratory." At this point we *1287 note that the record contains a copy of a Lafon brochure promoting the fact that it had registered nurses on staff.
Dr. Kumar testified that he takes care of the patients when they get to hospital, but that the nursing home physician tends to them in the nursing home.
Later, Dr. Kumar testified that if the patient's oxygen levels are good and the patient is feeling well he might need to be tested no more often than every 15 days or once a month. This is significant, because the plaintiff notes that the Louisiana Standards for Payment § XI(B)(b)(ii) (iii) classifies such services as requiring skilled care only if they must be performed on a regular basis (such as five or seven days a week) by licensed personnel, and it must also be necessary to perform them on an inpatient basis with the skilled nursing facility.
As further evidence of Mr. Francis's condition requiring skilled care at the time, the defendants cite the Standards for Payment list, "use of oxygen occasionally," as an example of Intermediate Care I service. Thus, according to the defendants, continuous oxygen, with its extensive professional monitoring requirements would, by implication, be a skilled service.
Sister Augustine, Lafon's Administrator, states in her affidavit that the administration of continuous oxygen is a treatment that requires skilled care that Lafon, an Intermediate care provider, legally cannot provide:
4) Lafon Nursing Home is, and has been since 1982, a Louisiana licensed nursing home certified to provide Intermediate Care I and II nursing care. Lafon was licensed as such during the residency of Jacob Francis, Sr. [Emphasis added.]
* * *
6) "Continous oxygen," or the administration of continous oxygen is treatment that constitutes skilled care that Lafon, as an Intermediate care I and II provider, cannot legally provide to its residents. Further, in accord with the Admission Policy of Lafon, "Continous Oxygen" is a medical problem that is cause for denial of admission to Lafon. [Emphasis added.]
This is a legal conclusion that Sr. Augustine is not competent to make for this Court.
The plaintiff counters that Louisiana's Standards for Payment § XI(B)(b)(iii)(vxxx) indicate that skilled nursing care may be required for the initial phases of a treatment program involving medical gases such as bronchodilator therapy, but this implies that after the initial phase, skilled care would no longer be necessary. The plaintiff contends that Mr. Francis had completed the initial phase no later than February 25, 1993, because Easthaven Care Facility, an Intermediate Care II facility was prepared to accept him on February 24, 1993, and Dr. Kumar on February 25, 1993, noted that Mr. Francis was scheduled to be discharged from the University Hospital Skilled Nursing Facility on February 26, 1993.
The admission form to Easthaven Care Center, the nursing home to which Mr. Francis was transferred from the University Hospital skilled care facility, indicates that the level of care specified for Mr. Francis was "ICFII", i.e., Intermediate Care II, not skilled care. This creates a genuine issue concerning why, if the reason Mr. Francis was transferred to Easthaven and not back to Lafon was because he needed skilled care, would his admission to Easthaven call for the lowest level *1288 of intermediate care rather than skilled care.
Section XI of the Department of Health and Human Resources "Standards for Payment" defines the applicable Title XIX Long Term Care standards as follows:
Skilled Nursing Care:
This is the maximum Level of Care provided to Title XIX clients in Long Term Care facilities. The conditions requiring this level of care are characterized by a need for intensive, frequent, and comprehensive monitoring by professional staff.
Intermediate Care I:
This is the medium level of care provided to Title XIX clients in Long Term Care facilities. The conditions requiring this level of care are characterized by a need for monitoring of moderate intensity.
Intermediate Care II:
This is the level of care provided to Title XIX clients in Long Term Care facilities characterized by the need for monitoring of less intensity than a Skilled Facility or Intermediate Care I Facility.
Considering the foregoing, we note the following unresolved issues:
1. Was the decision that Mr. Francis could not be returned to Lafon based on the erroneous assumption that he required Heparin treatments?
2. Had Mr. Francis passed the initial phase of continuous oxygen treatment such that his monitoring requirements were sufficiently infrequent that Lafon could have reasonably provided the service?
3. Did Lafon influence University Hospital's decision to send Mr. Francis to Easthaven or was University Hospital's decision truly independent?
4. How do the defendants explain the ability of Easthaven to deliver the level of care required by Mr. Francis but Lafon could not, when the only relevant evidence in the record indicates that Easthaven is only an Intermediate Care II provider offering the least skilled level of care, while Lafon holds itself out as an Intermediate Care I provider, i.e., Lafon holds itself out as an offering a higher level of care than Easthaven apparently does?
5. Why could Lafon not have offered Mr. Francis nebulizer treatment when, according to the deposition testimony of Dr. Kumar offered by the defendants in connection with their motion for summary judgment, such treatments require very little skill and are often self-administered or administered by family members?
Thus, we see many questions and no definitive answers. The defendants have failed to show an absence of factual support for one or more elements of the plaintiff's claim. The thrust of the defendants' motion for summary judgment was lack of causation based on the contention that Lafon could not provide the level of care that Mr. Francis required. The defendants have failed to carry the burden of proof at this stage of the proceedings to show an absence of factual support for an essential element of the plaintiff's claimthe essential element in this case being causation. La. C.C.P. art. 966 B(2). Therefore, it was error for the trial court to grant the defendant's motion for summary judgment.
II. THE PLAINTIFF'S CLAIMS AGAINST THE CONGREGATION OF THE SISTERS OF THE HOLY FAMILY
The defendants contend that:
[N]owhere in the record is there any evidence to support any claim against the Congregation of the Sisters of the Holy Family; nor does appellant give any reason for maintaining this action *1289 against the Congregation of the Sisters of the Holy Family. Plaintiff's alleged claims are solely against Lafon Nursing Home.
This is not entirely true. Plaintiff's brief contends that the Sister of the Holy Family "operated" the nursing home and throughout plaintiff's brief are references to the "defendants" in the plural form. However, neither the plaintiff's original petition, nor her amended petition makes any allegations from which any kind of legal relationship between the plaintiff's and Mr. Francis can be inferred; nor do those pleadings make any allegations from which any relationship between the nursing home and the Congregation of the Sisters of the Holy Family can be inferred. The only reference to the Sisters of the Holy Family in the original petition is found in paragraph "III":
Defendant, Sisters of the Holy Family is a non-profit corporation licensed to and doing business in Louisiana.
There is nothing in this allegation from which a claim against the Sisters might be established. Similarly, in the prayer for relief at the end of the original petition relief is requested against the nursing home only. There is no mention made of the Sisters.
However, in the plaintiff's amended petition, the tenth of the plaintiff's "General Allegations" alleges that, "Defendants operated a skilled nursing home facility ...," a reference that would include the Congregation of the Sisters of the Holy Family. Many of the allegations refer to the "defendants" in the plural form. Moreover, in the prayer of the amended petition both defendants are referred to by name and both are alleged to be jointly and severally liable for plaintiff's damages.
The defendants are represented by the same attorneys and filed a joint answer and other joint pleadings and joint filings, including this appeal. The defendants' answer contained no specific references to the Sisters and certainly nothing that would distinguish in any manner the liability of the Sisters from that of Lafon. There was no allegation that the Sisters was not responsible for the acts of Lafon in this manner. The defendants offered nothing in their motion for summary judgment and supporting argument and evidence that would separate the responsibility or liability, if any, of the nursing home from that of the Congregation of the Sisters of the Holy Family, i.e., the defendants offered nothing below that would warrant this Court to enter a dismissal of the plaintiff's claims against the Congregation of the Sisters of the Holy Family separate from the claims against the nursing home. The defendants argue, in effect, that the plaintiff had the burden on the motion for summary judgment of proving the basis for her claim against the Sisters. This argument misperceives the plaintiff's burden in responding to the defendants' motion for summary judgment. While it is true that the burden of proof at trial will be on the plaintiff, the burden of proof on this motion for summary judgment remains with the defendants as the movant. La. C.C.P. art. 966 B(2). In order to satisfy this burden, the Congregation of the Sisters of the Holy Family need not negate all essential elements of the plaintiff's claimit need only show an absence of factual support for one or more elements essential to the plaintiff's claim. Id. As the defendants failed to offer anything in connection with their motion that would have enabled the trial court to distinguish between the two defendants, the burden was not on the plaintiff to establish a separate set of facts regarding the Congregation of the Sisters of the Holy Family in order to keep it in the case without *1290 considering the case against the nursing home.
Plaintiff has not raised any procedural errors or jurisdictional errors concerning the rendering of the revised judgment dismissing her claims against the Sisters. However, we note on our own motion that the "Revised Judgment" of February 14, 2002, adding the additional defendant, the Congregation of the Sisters of the Holy Family, as having been inadvertently omitted, constitutes a substantive change in the original judgment, Caracci v. Williams, 95-16 (La.App. 5 Cir. 5/10/95), 654 So.2d 889. As the Caracci court explained in language remarkably pertinent to the instant case:
Thus it appears that the trial court may have inadvertently omitted two of the defendants in the original judgment, and tried to correct the omission with the amended judgment. Such a substantive amendment to a final written judgment is beyond the trial court's authority.
Id., p. 4, 654 So.2d at 891.
La. C.C.P. art.1951 is controlling:
A final judgment may be amended by the trial court at any time, with or without notice, on its own motion or on motion of any party:
To alter the phraselogy [sic] of the judgment, but not the substance[5]; or
To correct errors of calculation.
In Caracci the court noted procedural facts concerning the rendering of the amended judgment in that case identical to those surrounding the rendering of the "Revised Judgment" in the instant case:
[T]here is no indication from the record that either party filed a motion for new trial on the June 20, 1994 judgment. There is no indication in the amended judgment that the court granted a new trial and no record that any hearing was held before the amended judgment was rendered.
Id., p. 3, 654 So.2d at 891.
As this Court stated in Webster v. Boh Bros. Const. Co., Inc., 603 So.2d 761, 763 (La.App. 4th Cir.1992):
[T]rial judges lack the authority to make substantive amendments. Bruscato v. Century Ready Mix Corp., 569 So.2d 633, 634 (La.App. 2d Cir.1990). They are prohibited from making substantive amendments to final judgments on their own motions or on motions of any party. Daughdrill v. Tenneco Oil, 529 So.2d 104, 105 (La.App. 4th Cir.1988). Only three avenues are available to a party seeking to alter the substance of a final judgment: (1) timely application for a new trial, (2) petition for nullity, and (3) timely appeal. Bonaventure v. Pourciau, 577 So.2d 742, 745 (La.App. 1st Cir.1991).
In Webster this Court went on to hold that where the trial court does not follow one of the three prescribed methods for making a substantive amendment to a judgment, the amended judgment is an absolute nullity. When this Court notices such an absolutely nullity, we must vacate it on our own motion.
When the parties fail to raise the issue of absolute nullity of a judgment either by a new trial or on appeal, it is proper for the appellate court to vacate the absolutely null judgment and reinstate the original judgment due to the appellate court's power "to render any judgment which is just legal and proper upon the record on appeal." LSA-C.C.P. Art. 2164; Davenport *1291 v. Amax Nickel, Inc., 569 So.2d 23 (La. App. 4th Cir.1990). See also Stevenson v. State Farm, 624 So.2d 28 (La.App. 2d Cir. 1993); Rodgers v. Rodgers, 26,093, p. 4 (La.App. 2 Cir. 9/21/94), 643 So.2d 764, 766; Caracci, supra, p. 4, 654 So.2d at 891.[6]
Accordingly, we must vacate the "Revised Judgment" of February 14, 2002. Normally, this conclusion would cause this Court to reinstate the judgment of February 8, 2002. However, as we have decided to reverse the judgment of February 8, 2002 for reasons expressed earlier in this opinion, we will not reinstate it.
DECREE
For the foregoing reasons, the judgment of February 8, 2002 is reversed and remanded; the judgment of February 14, 2002 is vacated. The defendants are to bear the cost of this appeal.
JUDGMENT OF FEBRUARY 8, 2002 REVERSED AND REMANDED; JUDGMENT OF FEBRUARY 14, 2002 VACATED.
NOTES
[1] It appears that the Sisters of the Holy Family might be more properly referred to as the Congregation of the Sisters of the Holy Family. Regardless, in this opinion we may refer to that party simply as the "Sisters."
[2] Plaintiff does not challenge the initial decision to send Mr. Francis to University Hospital on January 29, 1993; nor does the plaintiff challenge the decision of that hospital to transfer Mr. Francis to its own skilled care facility on February. Plaintiff is complaining about Lafon's decision to refuse to take Mr. Francis back.
[3] We also note that the "Nursing Facility Agreement" executed between Lafon and Mr. Francis on November 27, 1989, states that it may be terminated on thirty days written notice.
[4] This requirement for "aerosol" treatment is what Dr. Kumar is referring to when he refers to "nebulizer" treatments in his deposition testimony discussed just below in this opinion.
[5] Emphasis added.
[6] We distinguish the cases of Bourgeois v. Kost, 02-396 (La.App.5 Cir. 10/16/02), 831 So.2d 337, and State v. Williams, 01-554 (La.5/14/02), 817 So.2d 40. In Bourgeois the judgment in question was not a final judgment (the appeal period had not expired at the time the error was noted) and was signed in error. Bourgeois relies on Williams. But in Williams the judgment, although signed in error, appears to have been a final judgment.

In the instant case the judgment was not a final judgment and it was not signed in error. However, Bourgeois and Williams both represent the camel's nose under the tent in the direction of relaxing somewhat what has heretofore been a sweeping and inflexible rule regarding the procedures for altering judgments by the trial court. See Judge Cannella's concurring opinion in Bourgeois.