JUDGE SANDRA CABRINA JENKINS
| ,This is an appeal of a June 9, 2015 judgment by the trial court rendered after a $1,375,000.00 jury verdict in favor of plaintiffs/appellees, Joachim ' Robinetté, Louis Robinette and Michael Robinette (collectively, the “Robinettes”); and against defendant/appellant, Lafon Nursing Facility of the Holy Family (“Lafon”), in a wrongful death and survival action arising from the death of appellees’ mother, Frances Robinette, who was a resident of Lafon’s nursing facility in New Orleans when Hurricane Katrina struck in August 2005.
For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The Robinettes are the adult children of 82-year-old Frances Robinette, who died at Lafon on September 1, 2005, four days after Hurricane Katrina- struck New Orleans.
Lafon is owned and operated by the Sisters of the Holy Family, who founded Lafon in 1842, and began operating at its current location on Chef Menteur Highway in 1973.
In 2003, Ms. Robinette was admitted as a resident of Lafon. Prior to Hurricane Katrina, Ms. Robinette was diagnosed as suffering from malignant |ahypertension, renal insufficiency, congestive heart failure, hyperlipidemia, dementia, neurosis, anxiety, cardiomegaly, left ventricular hypertrophy, and failure to thrive/anorexia. In April 2005, Ms. Robinette was given a PEG feeding tube..
On Friday, August 26, 2005, Hurricane Katrina entered the Gulf of Mexico. On Saturday, August 27, 2005, as the hurricane approached, New Orleans officials issued a “recommended evacuation” order. On Saturday, August 27, 2005, Sister Sylvia Thibodeaux, President of Lafon and head of Laforis “Administrative Hurricane Committee,” who was - watching the news/weather reports, concluded that “it was obvious ... that this [Katrina] was the big one,” and that “this [Katrina] was going to, be the one that we would not survive.” On Sunday, August 28, 2005, Sister Thibodeaux evacuated from New Orleans, via ambulance, herself and 75 nuns and six Lafon residents who were sisters of her Order. Dr. Joseph Labat, Laforis medical director and another member of the Administrative Hurricane Committee, had al *72 ready evacuated from the City with his father-in-law, who was a Lafon resident, on Saturday.
By Saturday, August 27, 2005, Sister Augustine McDaniel, Lafon’s chief administrator, had made the decision to shelter in place rather than evacuate the residents. Sister McDaniel testified that her decision to shelter in place was based on: (1) the frailty of the residents; (2) the physical and mental toll the evacuation would have on them; (3) the likely deaths of several residents; (4) the fact that La-fon rested on high ground in an area that had never flooded before; (5) Lafon’s two-week reserve of emergency and medical supplies, and sufficient staffing to care for the residents; and (6) Lafon’s emergency generator capable of providing electricity for an extended period of time.
Is At 10:00 a.m. on Sunday, August 28, 2005, the National Weather Service and news agencies issued the following warning: “DEVASTATING DAMAGE EXPECTED ... HURRICANE KATRINA ... A MOST POWERFUL HURRICANE WITH UNPRECEDENTED STRENGTH ... MOST OF THE AREA WILL BE UNINHABITABLE FOR WEEKS ... POWER OUTAGES WILL LAST FOR WEEKS ... AS MOST POWER POLES WILL BE DOWN AND TRANSFORMERS DESTROYED.” Also at 10:00 a.m. on Sunday, the mayor of New Orleans ordered a mandatory evacuation.
On the morning of Monday, August 29, 2005, Hurricane Katrina made landfall approximately 40 miles to the east of New Orleans. Lafon lost all electrical power. Shortly after the hurricane passed, “about a foot” of water entered the facility. Sister McDaniel testified that as soon as she saw the water, she ordered the 108 residents moved to the second floor, which was the convent area. None of the Lafon residents were injured by the flood water. Sister McDaniel testified that the flood water was in the building only “an extremely short while.” As a result of the flood water, the emergency generator stopped working. Sister McDaniel testified that, regardless of whether the generator failed, there would not have been any air conditioning in the building because the generator was not hooked up to the air conditioning system.
There was testimony at trial that the temperatures on the second floor of Lafon reached more than an estimated 100 degrees, with high humidity. Sister Mary Benjamin Auzenne, who was a nursing assistant at Lafon, testified that it was “very, very hot,” and that she and staff members tried to keep the residents cool using damp washcloths and cardboard fans. There was no running water or working toilets.
|4On Thursday, September 1, 2005, Ms. Robinette died. The Robinettes’ medical expert, Dr. William Bates, testified that her cause of death was heat stroke and dehydration resulting from the extreme conditions at Lafon following Hurricane Katrina. On Thursday, after Ms. Robinette died, Lafon evacuated 34 of its residents by bus to Houma, Louisiana. On Friday, September 2, 2005, FEMA evacuated the remaining residents by airlifting them to the airport. In the four days after Katrina, 17 Lafon residents died.
On August 28, 2006, the Robinettes filed a wrongful death and survival action against Lafon, Sister Sylvia Thibodeaux, Sister Eva Regina Martin, Sister Maria Gonzalez, Sister Augustine McDaniel[1], La-fon’s unnamed insurer, and several bus *73 and ambulance companies. The Petition alleged that, even though Lafon had filed a mandatory evacuation plan with the State of Louisiana, it failed to follow its own plan, turned away a bus company that had been contracted to evacuate residents, and chose to evacuate only certain residents of the facility, leaving Ms. Robinette and more than 100 other residents behind.
On January 31, 2007, Lafon filed an Answer to the Petition in which it asserted as an affirmative defense the comparative negligence of third parties, which included “entities or departments of federal, state, and local governments.”
On October 18, 2012, the Robinettes filed a Motion in Limine to Exclude Evidence of Third Party Fault of Governmental Agencies (“Motion in Limine”). The Robinettes argued that evidence of the alleged third party fault of the U.S. Army Corps of Engineers (the “Corps”), the Federal Emergency Management Agency (“FEMA”), the State of Louisiana, and the City of New Orleans was ^irrelevant because these governmental entities had no legal duty to Ms. Robinette and/or were immune from liability. The Robinettes also asserted that evidence of third-party fault would mislead and confuse the jury and unduly delay the trial, and that its probative value did not clearly outweigh the unfair prejudice to the Robinettes.
On October 29, 2012, Lafon filed an opposition to the Robinettes’ Motion in Li-mine, in which Lafon argued that, under La. Civ. Code art. 2323, Lafon was entitled to present evidence of the comparative fault of third-party governmental entities such as the Corps, FEMA, the State, of Louisiana, and the City of New Orleans, and that the fault of these third parties must be included on the jury verdict form.[2] Lafon also argued that, had there not been a catastrophic failure of the hurricane protection system negligently designed, constructed, and maintained by the Corps, none of the flooding at Lafon would have occurred. Lafon further asserted that, absent a complete breakdown of the emergency response from local, state, and federal governmental authorities, Lafon’s residents would have received the expected assistance following the storm.
A hearing on the Robinettes’ Motion in Limine was held on November 17, 2014. On January 7, 2015, the trial court signed a judgment granting the Motion in Limine.
A jury trial was held on May 26, 2015 through June 5, 2015. At the close of the Robinettes’ case, Lafon moved for a directed verdict on the Robinettes’ direct action claim against Lafon’s insurers, National Catholic Risk Retention Group and Christian Brothers Services Risk Pooling Trust. The trial court denied the motion. |fiThe verdict form given to the jurors only allowed them to allocate fault to Lafon, the Robinettes, and Ms. Robinette. On June 5, 2015, the jury found that Lafon breached its duty to protect the health and safety of Ms. Robinette, and found Lafon 100% at fault in her death. The jury awarded survival damages for Ms. Robinette’s physical and conscious pain and suffering and mental anguish in the amount of $1,000,000.00. The jury also awarded wrongful death damages of $125,000.00 each to the three Robinette children, for a total award of $1,375,000.00.
On June 9, 2015, the trial court signed a judgment in favor of the Robinettes and against Lafon in accordance with the jury’s verdict. Lafon appealed.
DISCUSSION
On appeal, Lafon asserts six assignments of error:
*74 1. The trial court improperly precluded Lafon from introducing any evidence of third party fault;
2. The Robinettes failed to prove medi- * ■ cal causation as a matter of law;
3. The jury verdict for survival damages in the amount of $1,000,000.00 is excessive based on the evidence and jurisprudence;
4. The June 9, 2015 judgment failed to properly allocate the award for survival damages among all surviving beneficiaries of Ms. Robinette;
5. The trial court abused its discretion by refusing to allow Lafon to attack the credibility of the Robinettes’ sole fact witness on causation; arid
6. It was unreasonable for the trial court to deny Lafon’s motion for directed verdict as to the Robi-nettes’ direct'action claims.

First Assignment of Error

Lafon contends that the trial court erred granting the Robinettes’ Motion in Limine, and refusing to allow it to introduce evidence of the fault of non-party governmental entities and permit the jury to consider and allocate comparative fault under La. Civ. Code art. 2323(A).
l7In general, this court reviews á ruling on a motion in limine involving the exclusion of evidence under an abuse of discretion standard. Joseph v. Williams, 12-0675, p. 10 (La. App. 4 Cir. 11/14/12), 105 So.3d 207, 214. But “[bjecause an abuse-of-discretion standard almost always requires an appellate court to défer to the trial court’s admittedly discretionary ruling, in order to obtain a reversal of such a discretionary ruling, a complaining party is usually required to show that the trial judge’s ruling was based on a mistaken application of law.” State v. Lee, 11-0398, p. 6 (La. App. 4 Cir. 1/30/12), 83 So.3d 1191, 1196 (citing Koon v. U.S., 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). “When a‘trial judge’s ruling is based upon a legal mistake, the ruling is no longer éntitled ¡ to deference by the reviewing court.” Id. (“A district - court by definition abuses its discretion when it makes an error of law.”).
La. Civ. Codé art. 2323: Comparative Fault of Non-Parties
La. Civ. Code art. 2323(A) states:
A. In any action for damages where a person suffers injury, death, or loss, . the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, .including but not limited to the provisions of R.S, 23:1032, or that the other person’s identity is not known or reasonably ascertainable.,
In Art. 2323(A), Louisiana adopted a pure comparative fault system which created a mandatory, substantive right to quantify the fault of “all persons causing or contributing” to the plaintiffs damage. Keith v. U.S. Fidelity & Guar. Co., 96-2075, p. 7 (La. 5/9/97), 694 So.2d 180, 183. In Dumas v. State ex rel. Dept. of Culture, Recreation & Tourism, 02-0563, p. 11 (La. 10/15/02), 828 So.2d 530, 537, the Supreme Court, in upholding the défendant’s right to present, as an affirmative defense, evidence relating to the fault of a third party, held that La. Civ. |sCode art. 2323(A) “clearly requires that the fault of every persori responsible for plaintiffs injuries be compared, whether or not they are parties, regardless of the legal theory of liability asserted against each person.”
*75 Under Louisiana’s comparative fault system, “it [is] the task of the factfinder to allocate shares of negligence.” Keith, 96-2075, p. 7, 694 So.2d at 183. See also Dupree v. City of New Orleans, 99-3651, p. 18 (La. 8/31/00), 765 So.2d 1002, 1015 (“In any action for damages, the trier-of-fact must determine the percentage of fault of all persons causing or contributing to the damage.”).
In Lafon’s Answer to the Robinettes’ Petition, Lafon specifically pled, as an affirmative defense, the comparative fault of third parties, including but not limited to entities or departments of federal, state, and local government.
Pursuant to the Supreme Court’s holdings in Keith and Dumas, Lafon, therefore, was entitled to present evidence at trial of the negligence and fault of non-parties, including the Corps, FEMA, the State of Louisiana, and the City of New Orleans. Accordingly, we find that the trial court erred in depriving Lafon of the opportunity to present this evidence. Foley v. Entergy Louisiana, Inc., 04-1967, p. 4 (La. App. 4 Cir. 2/15/06), 925 So.2d 638, 641, aff'd in pertinent part, rev’d in part, 06-0983 (La. 11/29/06), 946 So.2d 144.
La. Code Civ. P. art. 966(G): Motion for Summary Judgment As to Non-Parties
We must also point .out that the proper procedural vehicle for excluding evidence of non-party fault is not by a motion in limine, but by a motion for summary judgment under La. Code Civ. P. art. 966(G), which in October 2012 (when the Robinettes filed their Motion in Limine) provided as follows:
When the court grants a motion for summary judgment in accordance with the provisions of this Article, that a party or non-party is not ^negligent, is not at fault, or did not cause, whether in whole or in part, the injury or harm alleged, that party or non-party shall not be considered in any subsequent allocation of fault. Evidence shall not be ad? mitted at trial to establish the fault of that party or non-party nor shall the issue be submitted to the jury nor included on the jury verdict form. This Paragraph shall not apply when a summary judgment is granted solely on the basis of the successful assertion of an affirmative defense in accordance with Article 1005, except for negligence or fault.
See 2012 La. Acts, No. 257, § 1, effective August 1,2012.
Because Lafon was entitled to present evidence to the jury of non-party fault under La. Civ. Code art. 2323(A), and because the only procedural vehicle for excluding such evidence is by a motion for summary judgment under La. Code Civ. P. art. 966(G), we find that the trial court’s judgment granting the Robinettes’ Motion in Limine was a mistaken application of law such that the ruling is no longer entitled to deference by this court. We further find the trial court’s error in denying La-fon the right to present evidence of non-party fault at trial is reversible error. Foley, 04-1967, p. 4, 925 So.2d at 641.
That does not , end our inquiry. In Foley, as here, this court .concluded that the trial court erred in excluding evidence of third-party fault. But after reversing the trial court’s ruling, the court went on to examine the evidence of such fault submitted by the defendant by virtue of its proffer. Upon reviewing that proffered evidence, and the record in its entirety, this court concluded that the third parties were not at. fault in any way, and declined to assign a percentage of fault to either entity.
On review by the Supreme Court,'the defendant in Foley argued that this court erred in rendering judgment on the issue *76 of third-party fault on the basis of the record before it, rather than remanding the case to the trial court for a new trial. The Supreme Court disagreed, stating that, “[a]lthough a court should always |inremand a case whenever the nature and extent of the proceedings dictate such a course, whether or not any particular case should be remanded is a matter which is vested largely within the court’s discretion and depends on the circumstances of the case.” Foley, 06-0983, p. 29, 946 So.2d at 164. The Supreme Court declared that, “[ujnder the particular circumstances of this case, and mindful of our repeated admonition that the remand procedure must be ‘sparingly exercised,’ we cannot conclude that the court of appeal abused its discretion in this regard.” Id., 06-0983, p. 30, 946 So.2d at 165.
In light of the discretion afforded us, we elect to decide the issue of nonparty fault on the basis of the record before us, rather than remanding for a new trial.
In apportioning fault under Louisiana’s comparative negligence scheme, the Supreme Court has adopted the duty-risk analysis used to establish delictual liability under La. Civ. Code art. 2315. Fontenot v. Patterson Ins., 09-0669, p. 9 (La. 10/20/09), 23 So.3d 259, 267. Under the duty-risk analysis, the plaintiff must prove that: (1) the defendant had a duty to conform its conduct to a specific standard (the duty element); (2) the defendant’s substandard conduct failed to conform to the appropriate standard (the breach element); (3) the defendant’s substandard conduct was a cause in fact of the plaintiffs injuries (the cause in fact element); and (4) the defendant’s substandard conduct was a “legal cause” of the injuries (the scope of liability or scope of protection element). Chatman v. Southern Univ. at New Orleans, 15-1179, pp. 10-11 (La. App. 4 Cir. 7/6/16), 197 So.3d 366, 375. If the plaintiff fails to satisfy even one of the • elements of the duty-risk analysis, the defendant is not hable. Id., 15-1179, p. 11, 197 So.3d at 374-75.
|nIn this case, Lafon does not assign as error the jury’s finding that Lafon breached its duty to protect the health and safety of Ms. Robinette, and that this breach was a proximate cause of Ms. Robinette’s death. Although we are not required to address Lafon’s fault, as part of our comparative fault analysis, we review the record for evidence relating to Lafon’s conduct.
Lafon’s Emergency Preparedness Plan
In 2005, state law required that Lafon have an emergency preparedness plan “designed to manage the consequences of natural disasters or other emergencies that disrupt the nursing home’s ability to provide care and treatment or threaten the lives or safety of the nursing home residents.” LAC 48:1.9729.[3] By law, Lafon’s plan had to conform to the model plan issued by the Office of Emergency Preparedness (the “Model Plan”).
The Model Plan stated that, in developing an emergency preparedness plan, the following assumptions are to be “accepted as facts” and “govern the plan”:
• Facility operators are responsible for their Clients at all times in all emergencies and evacuations, government-ordered or otherwise.
• In an emergency situation, usual utilities and services could be unavailable for 48 hours or more.
• The time required to obtain a response from emergency services will *77 increase in proportion to the severity, magnitude, and nature' of the emergency.
The Model Plan also stated:
In an emergency, the facility may be without telephone, electric power, or public water and sewer service. Utility outages may last for several days. The facility must be able to exist on its own for at least 48 hours, without outside assistance. Plans must provide for alternative sources of water, lighting, temperature control for medicines, waste disposal, etc.
112The Model Plan required that the nursing facility “[s]how that [it] ha[d] an auxiliary emergency power generator(s)” and “[s]how whether the generator ha[d] the capacity to supply all the electric power to run the entire facility and all powered equipment.” The Model Plan also required the facility to “indicate whether the generator [was] above the projected flood level.”
The Model Plan anticipated a hurricane such as Katrina, which would be a “catastrophic emergency” requiring an evacuation of the entire parish:
Catastrophic Emergencies: Many parishes in Louisiana are subject to catastrophic emergencies, such as hurricanes or widespread flooding that would require the evacuation of the entire parish, and relocation of the parish population to a safe area. ... Nursing homes that are located in parishes that are subject to catastrophic emergencies will make arrangements to move out of the danger, or risk area, to safety. [Emphasis added.]
The Model Plan also considered the option of sheltering in place: “In the event of a fast moving emergency, such as a tornado, a flash flood, or a hazardous materials incident, it may not be advisable to evacuate the facility.”[4]
Lafon’s Evacuation Plan
On April 16, 2005, Lafon submitted an “Evacuation Plan” to the City of New Orleans Office of Emergency Preparedness. According to Lafon’s Evacuation Plan, the decision to evacuate or remain in the facility was the responsibility of a special Administrative Hurricane Committee which included Sister Thibodeaux, Sister Martin, Sister McDaniel, and Lafon’s medical director, |1sDr. Joseph Labat. The Evacuation Plan provided that the committee’s decisions about mobilization “may include” both sheltering in place and evacuation:
1. To remain at Lafon Nursing Facility, however, if there is a shortage of staff available, transfer beds to the dining area
2. To transfer residents:
a. To the second floor of Lafon
b. Move 10-12 residents to Lafon Child Care Center
c. Send resident sisters and 40 other residents to the Mother house[5]
d. Call family members to assist by taking loved ones home
e. Ask Methodist Hospital to admit residents who are tube feeders
3. To evacuate to out-of-town shelters:
*78 a. St. Joseph Abbey, St. Benedict, Louisiana or
b. Heritage Manor of Franklinton
The Evacuation Plan also set forth La-fon’s evacuation procedures under two separate scenarios:
IF WE ARE REQURED TO LEAVE THE FACILITY BECAUSE OF FLOODING:
We will transport residents to the Moth-erhouse, Lafon Child Care Center
TRANSPORTATION INCLUDES:
1. Ryder trucks will be used to transport supplies
2, Twenty vehicles (cars, vans or station wagons) will be needed to move ■ residents with each making two (2) trips, riding three (3) residents at a time (3 residents X 20 vehicles X 2 trips = 120 residents)
IF WE ARE REQUIRED TO EVACUATE NEW ORLEANS BY ORDER OF THE OFFICE OF EMERGENCY MANAGEMENT:
We will transport residents to:
St. Joseph Abbey, St. Benedict Louisiana (see directions pg. 9) or Heritage Manor of Frankinton (see directions pg. 9)
TRANSPORTATION INCLUDES:
Hotard Motor Coach Services (2 buses are contracted, one is a lift bus)
. [uIt is the assumption that at least thirty (30) residents will leave the facility with family members, and another ten (10) to twelve (12) will be admitted to the hospital.
With respect to Model Plan’s requirements for án emergency generator, La-fon’s Evacuation Plan stated: “The facility has an auxiliary emergency power generator which provides light to all hallways, telephones, .refrigeration, and outlets for emergency use.” Lafon did not disclose in its Evacuation Plan that its emergency generator was not hooked up to the air conditioning and forced ventilation system. Lafon also did not disclose in its Plan that the fuel pump for its generator was' not elevated.
By letter dated July 26, 2005, the New Orleans Office of Emergency Preparedness advised Lafon that it had “met all the requirements stipulated by the Louisiana State Model Plan,” and that Lafon “[was] in compliance with the revised statutes.”
April 26, 2005 Hurricane Evacuation Meeting
On April 26, 2005, ten days after Lafon submitted its Evacuation Plan to the Office of Emergency Preparedness, Lafon had a hurricane evacuation meeting" ^dth several of the residents’ family members. Even though Lafon’s Evacuation Plan gave assurances that Láfon was adequately prepared to evacuate all of its residents if a mandatory evacuation order was issued, the April 26, 2005 minutes state as follows:
In the event of a hurricane, if we feel we must move away from the units, we will go into the dining room or may evacuate to the day care center. Our own sisters will be moved to the Mother House. Some people will go to the hospital, i.e. tube feeders and special needs. She [Sister McDaniel] feels sure they will be open for these residents. We might evacuate to the second floor. If we mandated [sic] to leave the city, your loved ones are going to be in serious trouble. We will not have available the 50 ambulances it would take to transport safely and conveniently.
lnWe do have agreements with St. Joseph Abbey ’ in Covington and Heritage Manor in Franklinton. The difficulty is how to get residents on the bus. The few who walk and talk cannot follow commands. If we stay, we will have food *79 and an emergency generator. If we leave, we can expect a 9-10 hour trip. You have no idea how difficult it is to move 100 people onto buses. [Emphasis added.]
And notwithstanding the assurances made by Lafon in its Evacuation Plan, the minutes also reflect that Sister McDaniel told family members at this meeting that “she [had] no plans to travel out but if [they] [were] told to leave, [she] [would] be asking [her] staff to perform a task that is next to impossible.” [Emphasis added.]
Lafon’s Decision Not to Evacuate
At trial, Sister McDaniel testified that she was responsible for making sure that Lafon had an emergency preparedness plan in place, and was responsible for “managing” the plan. Sister McDaniel was asked about the three “options” in Lafon’s Evacuation Plan:
Q. What about evacuation? Did—did Lafon, have any type of position going into a hurricane what it would—what its plan would be based on the options in this—in this document?
A. Did we have a plan?
Q. Based on these options, did— what was—what was the position, the typical, the normal position going into a hurricane?
A. Well, we were not going to evacuate—evacuate unless we were told to evacuate in a timely manner.
Q. And—
A. And timely manner meaning time for us to safely move our residents. [Emphasis added.]
Even though Lafon’s Evacuation Plan did not condition its evacuation on a “timely” evacuation order, Sister McDaniel testified that Lafon was only responsible for evacuating its residents if the'evacuation order was given in a “timely manner”:
I i,Q. Lafon had the responsibility to prepare its facility so that it was as safe as possible for residents in the event of a hurricane; is that correct?
A. That is .correct. And we did that.
Q. As part of your hurricane safety plan, was it Lafon’s responsibility to evacuate residents, if necessary?
A. If necessary and time—and in a timely manner, if the order was given in a timely manner, yeah.
Q. Lafon had the responsibility to have a proper evacuation plan in place in the event of a hurricane. Correct?
A. And we did.
Q. Okay. Lafon’s responsibility included making sure it could timely and safely evacuate residents in'the event of a hurricane. Correct?
A. I’m challenged by the question, because if the City gives the order to evacuate and the City gives it on Sunday, I can’t evacuate a hundred people on Sunday. I don’t have enough time to travel nine hours anyplace.
Q. Okay. Well—
A. But—but if it—if—if the timeliness is more appropriate, yes, if I have—and I don’t have a bumper-to-bumper traffic on the highway like the— yes.
Non-Party Fault
We now review both the evidence of • non-party fault that was proffered by La-fon, and the “record of the case in its entirety.” Foley, 06-0983, p. 28, 946 So.2d at 163.
Lafon proffered the expert reports of Walter' S. Maestri, Ph.D. (“Maestri Report”) and G. Paul Kemp, Ph.D. and Ivor L. van Heerden, Ph.D. (“Kemp Report”).
Dr. Maestri opined, in general, that local, state, and federal governments had the *80 “duty and responsibility” to: (1) provide citizens with well thought-out plans for emergency response in advance of anticipated natural disasters; and (2) insure that citizens’ fundamental needs were addressed when those plans were executed, including services such as search and rescue, immediate medical care, food and water, and transportation out of impacted areas.
117With respect to Hurricane Katrina and Ms. Robinette in particular, Dr. Maes-tri opined that local emergency preparedness officials should have: (1) conducted a census of each nursing home to determine which facilities were evacuating and which facilities were sheltering in place; (2) promptly assessed each nursing facility that had sheltered-in-place to confirm the need for assistance, such as ice, food, water, or medical care; and (3) transferred residents needing medical intervention to a local shelter.
With respect to FEMA in particular, Dr. Maestri stated that FEMA failed in its duties to provide and distribute ice, food and water, and back-up power generators.
The Maestri Report’s conclusions were as follows: (1) Lafon could not be faulted for the Corps of Engineers’ negligent design, construction, and maintenance of the hurricane protection system that directly led to the flooding of Lafon; (2) Lafon was not responsible for the chaos that occurred in the New Orleans area resulting from the complete lack of command and control within city government, the federal government, law enforcement agencies, and the State; and (3) Lafon, in planning for hurricane contingencies, was entitled to rely upon a reasonable level of planning, protection, and response from these governmental agencies, the lack of which was the direct cause of the conditions experienced at Lafon.
The Kemp Report concluded as follows with respect to the failures of the Army Corps of Engineers:
The flooding at Lafon was the result of the [Corps’] failure to build a hurricane protection system that met the criteria of the 1965 Flood Control Act, and also due to mistakes, sometimes very simple, that were never reassessed during the 40 years that the project was under construction. These included determining likely surge h ¡¡elevations, use of appropriate or obsolete survey information, a lack of respect for the problematic nature of coastal Louisiana soils and subsidence, and, perhaps most importantly, the role of the MRGO in amplifying surge and waves in the Lake Borgne funnel. All of these factors had been brought to the attention of the Corps, in some cases repeatedly, since Hurricane Betsy. But the Corps did not have an effective independent review process, such as is now required for any project designed for public safety in an urban area wellbeing.
In addition to these proffered expert reports, the record includes the deposition testimony of the Robinettes’ expert, Dr. Joel L. Nitzken, in which he stated that the Corps had a responsibility to the residents of Lafon to build the flood protection system in a non-negligent manner, and that the flooding of the greater New Orleans area was caused, at least in part, by the design, construction, and maintenance failures of the hurricane protection system.
One of Lafon’s expert witnesses, Dr. Brobson Lutz, testified as follows regarding the fault of the Corps:
The surge from the federally constructed Mississippi River Gulf Outlet was what caused Lafon to flood. If it had not been for concurrent other manmade disasters such as non-functional pumping stations and crumbling federally- *81 built levees, emergency responders could easily have evacuated Lafon residents on the Monday or Tuesday after the surge receded. Most of the Katrina-related deaths at Lafon were due to the cascade of these manmade disasters which prevented an earlier response.
Fault of Corps of Engineers
Experts testified that the Corps of Engineers breached its duty to protect Lafon residents from flooding caused by the negligent design, construction, and maintenance of MRGO.
“To the extent that a party defendant seeks to have the benefit of comparative fault of another as an affirmative defense, ... it bears the burden of proof by a preponderance of the evidence that the other party’s fault was a causej^in-fact of the damage being complained about.” Dupree, 99-3651, p. 18, 765 So.2d at 1014 n.13.
Conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about the harm, i.e., but for the defendant’s conduct, the plaintiff would not have sustained the injury. Francis v. Lafon Nursing Home of Holy Family, 02-1863, p. 3 (La. App. 4 Cir. 3/19/03), 840 So.2d 1281, 1283. Although a party’s conduct “does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability.” Lasyone v. Kansas City Southern R.R., 00-2628, p. 9 (La. 4/3/01), 786 So.2d 682, 691.
Following our de novo review of the proffered and record evidence regarding non-party fault, we cannot say that but-for the conduct of the Corps of Engineers, Ms. Robinette would not have died from heat stroke on the second floor of Lafon five days after the City of New Orleans had issued a mandatory evacuation order.
The record shows that flooding at Lafon was not the cause-in-fact of Ms. Robi-nette’s death. Only one foot of water entered the building, and that water receded quickly. Ms. Robinette was not harmed by the flood water. Ms. Robinette’s cause of death was heat stroke and dehydration due to her exposure to sweltering heat for four days. And Ms. Robinette’s exposure to those extreme heat conditions was caused by Lafon’s refusal to follow its own Evacuation Plan, and by the inadequacy of La-fon’s backup emergency power generator. But for Lafon’s substandard conduct, Ms. Robinette would not have succumbed to heat stroke caused by the lack of electrical power.
Because the Corps of Engineers’ conduct was not the cause-in-fact of Ms. Robi-nette’s death, we find no fault by the Corps.[6]
Fault of FEMA, State of Louisiana, and City of New Orleans
Dr. Maestri described FEMA’s failures as follows:
The Federal Emergency Management Agency’s failures during Hurricane Katrina have been completely documented elsewhere. Ice, food and water provision and distribution was their primary immediate responsibility. This did not happen. FEMA also committed through delegation to the United States Army Corps of Engineers to provide back-up power generators to the impacted juris *82 •dictions when and where required. SEMA confirmed these commitments as late as the Friday evening before Katrina’s landfall. This too did not happen even though it was assured to the Louisiana Nursing Home Association.
Dr. Maestri also stated that local emergency preparedness officials had the duty to: (1) conduct a census of each nursing home to determine which facilities were evacuating and which facilities were sheltering in place; (2) promptly assess each nursing facility that had sheltered-in-place to confirm the need for assistance, such as ice, food, water, or medical care; and (3) transfer residents needing medical intervention to a local shelter.
Under the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, et seq., the State of Louisiana and the City of New Orleans are totally immune from liability for the death of any persons as a result of their homeland security and emergency preparedness activities during Hurricane Katrina. Freeman v. State, 07-1555, p. 5 (La. App. 4 Cir. 4/2/08), 982 So.2d 903, 908 (citing La. R.S. 29:735(A)(1)). Directors, heads, and employees of the State of | ^Louisiana and the City of New Orleans would only be found liable in cases of willful misconduct, which we do not find here. Id., 07-1555, pp. 5-6, 982 So.2d at 908.
Under principles of sovereign immunity, FEMA also is immune from liability based on its alleged failure to provide adequate shelter, medical services, triage, evacuation, and transportation during Hurricane Katrina. Freeman v. U.S. Dept. of Homeland Sec., 06-4846, 06-5689, 06-5696 (E.D. La. Apr. 30, 2007), 2007 WL 1296206, at *8, aff'd, 556 F.3d 326 (5th Cir. 2009).
In sum, based on our de novo review of Lafon’s. proffered evidence and the record as a whole, we find no fault by FEMA, the State of Louisiana, or the City of New Orleans.

Second Assignment of Error

Lafon contends that the Robi-nettes failed to carry their burden of proof as to medical causation, i.e.,- the causal connection between Ms. Robinette’s death and Lafon’s allegedly substandard conduct.
Dr. William Bates is -an expert hospitalist and ah expert in internal medicine. At trial, Dr. Bates testified as follows: (1) based on his review of Ms. Robinette’s medical records and her medical history, she was in a stable medical condition prior to Katrina;. (2) the extreme heat conditions at Lafon in the days after Katrina caused Ms. Robinette’s death by heat stroke; (3) Ms. Robinette’s death certificate, which listed the primary cause of death as “Hurricane Katrina Related Death,” supported his. opinion as to medical causation; (4) Ms. Robinette’s autopsy report, which showed moderate blockages in her heart, confirmed his conclusion that the heat stroke would have caused her vessels to dilate, making it more difficult to drive the blood past the blockages, causing the heart muscle to die.
122Pr. Bates described in detail how the extreme heat conditions at Lafon caused Ms. Robinette’s death:
Well, in the case of someone who is on fluid -medicine, who has kidney disease, who has heart disease, congestive heart failure, fluid balance is very important. This is a lady who was getting medicine to help her [urinate], but also required coaxing and help to eat enough and drink enough to sustain herself. ... If you are given the diuretics, and she is not eating or drinking, well, then, you are worried about her getting dehydrated and her circulation going down. *83 If she is getting fluids and everything but not getting her medicine, she may retain some fluid and may put some more stress on her heart and respiratory system as well, but eventually, the heat is going to trump everything. When she gets hot, and her temperature gets up, her neurological condition is going to worsen. ... By the time it gets up to 103, 104, then people are hurting, they are aching, they are breathing really fast. Your body is trying to get rid of this heat. You’re sweating profusely, so you are losing even more fluid now. So you get into a cycle where the body is not protecting itself, it’s actually contributing to its own problems.
Lafon contends that the Robinettes’ sole causation expert, Dr. Bates, did not establish medical causation because he allegedly conceded that he had no opinion as to medical causation if Ms. Robinette had been properly hydrated, and he was unaware of any evidence that Ms. Robinette was not properly hydrated.
At trial, counsel for Lafon asked Dr. Bates as follows:
Q. I want you to assume that [Ms. Robinette] was hydrated, I want you to assume that she was fanned, I want you to assume that she was nourished. Okay?
■ A. Yes.
Q. Based on all those assumptions, Doctor, and if all that had occurred, you would have no other explanation for her demise.' It would not be based on heat stroke; right?
A. No. It certainly could be. It’s not necessarily true that those things would be adequate to keep her cool. There’s no record of her temperature. And apparently no one knows how hot it was in there. So, it’s impossible for me to say whether or not those measures would have been adequate.
In response to Dr. Bates’s testimony, counsel for Lafon tried to impeach Dr. Bates with his prior deposition testimony:
UsQ. So; sir,- at that time the question was, “And if Frances Robinette was properly hydrated by the staff at Lafon after the storm, if that had occurred, would you have any other explanation for her demise?” And what was your answer then?
A. No.
Q. That’s not what you just told this jury, is it?
Dr. Bates then clarified his trial testimony;
A. Properly hydrated would have prevented the circulatory collapse with heat stroke. I don’t know whether she was properly hydrated or not..But properly would imply that they were measuring her inputs and outputs, they were weighing her arid they were keeping up or making decisions to hold diuretics. We don’t have any records for that. So, if the hydration had been proper—But that’s not the question-you asked me earlier. The question you asked was assume she had been given fluids and all that. Fluids may not—Simple fluids in that situation may not have been adequate to protect her from the environmental impact of the post-storm environment.
Dr. Bates then explained the important difference between being “hydrated” and “properly hydrated”:
A. Properly hydrated means it’s proper for that patient’s condition at that time in those conditions. Hydrated means you’re giving the patient fluid. You. can overhydrate, you can underhydrate, but you have to assess the patient. It’s especially important in a patient like [Ms. Ro- ■ binette] who has both congestive *84 heart failure and kidney disease because they have both problems with retention of fluid and not being able to eliminate it normally.
Dr. Bates’s testimony, as clarified, and taken in its full context, was that Ms. Robinette (as an elderly person with heart and kidney problems), who was exposed to extreme heat temperatures for days on end, could not be “properly hydrated” even with what would, under normal circumstances, be considered sufficient water. We find this evidence sufficient to support Dr. Bates’s conclusions regarding medical causation.
This second assignment of error is without merit.

Third Assignment of Error

| ?4Lafon contends that the jury’s award of $1,000,000.00 in survival damages is excessive in light of the evidence presented at.trial, and that the jury’s award was, at least partially, punitive in nature, constituting an abuse of discretion.
Specifically, Lafon asserts that the Robi-nettes did not put forth any “actual” evidence of conscious or physical suffering by Ms. Robinette that would support a $1,000,000.00 award.
“In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” La. Civ. Code art. 2324.1.
According to the Supreme Court:
The assessment of “quantum,” or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, “the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.” Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La. 1993). Moreover, “before a Court of Appeal ean disturb an award made by a [fact finder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the [trier of fact] abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion of that court.”
Wainwright v. Fontenot, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (quoting Coco v. Winston Indus., Inc., 341 So.2d 332, 334 (La. 1977)).
“Generally, survival damages are warranted if the plaintiff presents any evidence (‘a scintilla’) of pain and suffering on the part of the decedent.” Turner v. Lyons, 03-0186, p. 10 (La. App. 4 Cir. 1/28/04), 867 So.2d 13, 20.
[^Preston Smith, the husband of a Lafon staff member, testified at trial regarding the horrific conditions he saw at Lafon on Monday, August 29, 2005, after he had carried the residents up to the second floor via the stairs:
Q. And you said you laid them out in the hallways and in the rec room?
A. Yes, sir.
[[Image here]]
Q. Can you describe to the jury how they were laid out in the hallway?
A. We laid them in the hallway as soon as we got them up on the floor. It wasn’t no particular—We just had residents stretched along that whole second floor and that rec room. ... The residents were laying, some were laying down and some were sitting in an upright position.
[[Image here]]
*85 Q. Can you give the jury a sense, just approximately, how many residents we’re talking about?
A. A total, I want to say, a hundred, maybe 101 residents.
Q. To be clear, there were no beds or anything in the hallway?
A. No beds.
Q. I think you had mentioned that the power had gone out?
A. Yes, sir.
Q. Can you describe the lighting conditions upon the second floor?
A. We were in total darkness. There was no power.
[[Image here]]
Q. We’re in the Monday evening. Please describe for the jury the temperatures up there that you experienced.
A. Unbearable. Very, very hot. It was unbearable. Not easy to breathe up in that heat. The residents were uncomfortable. It was unbearable, the heat.
Q. Mr. Preston, what was your perception in terms of putting a temperature on it up there. What was your perception?
A. A hundred degrees plus.
Q. [C]an you give the jury a sense of what those conditions were in terms of feel, air, smell?
A. It got so hot up there, some of the female residents had to take their clothes off. I’m looking at female residents in their panties and their bras. That’s how hot it got up there. And it was nothing else they could do but just take their clothes off to try to get comfortable.
Q. How was the circulation up there?
A. There was no circulation. You didn’t have no air, no breath at all. They had windows on the second floor that were not able to be opened. So, you didn’t have no flowing air or nothing like that at all.
Q. What was the smell like?
|2fiA. They had residents that had made bowel movements on themselves. It was like the heat was cooking the feces in there. That’s the smell. You had the smell of the feces and you had the heat combined.
Q. Did you have running water?
A. No, we didn’t.
Mr. Smith testified that these “gory” conditions at Lafon remained the same on Tuesday, Wednesday, and Thursday, with unbearable heat, no running water, no power, and with the residents continuing to he on the floor without beds.
Ms. Robinette’s son, Michael, testified at trial about his mother’s abhorrence of heat and bad odors:
A. [M]y mother could not stand being hot. For the 4th of July, we’d be by Louis, Jr.’s house, dude, she would sit in the house, we’re all out in the swimming pool. It’s too hot out there. We’re having a party; we’re having a good time. She would not fool with nothing that would make her sweat. So, I know she was miserable in all that heat and stench. And then I know what she thought of herself. What made me think about it, she had the same wet, nasty ... clothes on for three days. Jesus, man, just the thought of that gives me the creeps. And I’m telling you, she was the biggest smell fanatic God ever created. Oh, boy, you smell like a dog, go on and go get a bath. Okay. Dude, you just didn’t, not around my mother, you just didn’t. Even to the effect where if you came out and still wasn’t smelling right, she came and washed you.
*86 There also was evidence that Ms. Robi-nette was fully conscious, aware, and alert immediately prior to Katrina. Dr. Bates testified about the physical effects of the heat stroke that caused Ms. Robinette’s death:
Heat stroke is what happens when your body gets above that 105 degrees. In addition to the neurological damage, the body goes into shock. It affects the cardiovascular system. Shock is when you lose effective circulation. In other words, blood is not getting circulated through your body. ... Often the blood vessels dilate, you lose effective blood pressure. Without pressure, you don’t get a flow. So those blood vessels, the blood pools in the bigger blood vessels, it doesn’t get out to the capillaries, tissue begins to break down, the PH in the body drops, the vasodilation gets worse, and you are in an uncontrollable shock condition.
lain light of this evidence, we cannot say the amount of damages for Ms. Robinette’s pain and suffering, as determined by the jury, is “beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances.” Youn, 623 So.2d at 1261. Accordingly, we find no abuse of discretion in the jury’s award of $1,000,000.00 for Ms. Robi-nette’s pain and suffering.
Lafon also contends that the jury’s survival damages should be reduced to the “highest reasonable award” of $150,000.00 so as to be consistent with other awards for similar injuries, We reject this contention. “Only after abuse of discretion is established is an examination of awards in similar cases appropriate.” Williams v. Mathieu, 13-1373, p. 7 (La. App. 4 Cir. 10/29/14), 155 So.3d 54, 59. Based on our finding of no abuse of discretion by the trier of fact, we need not resort to an examination of prior awards.
This assignment of error has no merit.

Fourth Assignment of Error

Lafon contends that the trial court was required to allocate the total survival damage award among all four heirs of Ms. Robinette, including one child who filed a separate action that was settled in 2008. Lafon argues that because its obligation to the children of Ms. Robinette is a joint obligation under La. Civ. Code art. 1788, and because the object of Lafon’s performance—money damages—is divisible under La. Civ. Code art. 1815, the amount of survival damages should be reduced by 25%, as the three plaintiffs can only recover their virile share (75%) of the total amount awarded to Ms. Robinette for her survival claim. Lafon relies on Guilbeau v. Bayou Chateau Nursing Ctr., 05-1131 (La. App. 3 Cir. 5/17/06), 930 So.2d 1167.
laJn Guilbeau, four of five surviving children brought a survival action on behalf of their mother for damages she suffered while in the care of a nursing facility. After a bench trial, the trial court rendered an award of $100,000.00 to the four plaintiffs. On appeal, the defendants in Gu-ilbeau argued that because the trial court erred in failing to account for the remaining child’s virile share, the award should be reduced accordingly. The Guilbeau court disagreed, finding that because the trial court was aware of the decedent’s fifth child, and because there was no evidence that the trial court failed to take this fact into consideration when it made its award, there was no reason to adjust the award based upon a finding that the existence of other beneficiary was not taken into account.
Likewise, in Randall v. Concordia Nursing Home, 07-101 (La. App. 3 Cir. 8/22/07), 965 So.2d 559, the Third Circuit applied the same analysis and reached the *87 same conclusion with respect to a jury award of survival damages.
We find the courts’ analysis in Guilbeau and Randall persuasive on this issue. At trial, all three Robinette plaintiffs testified about their brother, Dwight Robinette, who was not a party to their suit. Thus, the jury was aware that Ms. Robinette had another child who was not part of the case. There also is no evidence that the jury failed to take this into consideration when it made its award. See Randall, 07-101, p. 19, 965 So.2d at 572.
Accordingly, we find this assignment of error is without merit.

Fifth Assignment of Error

Lafon contends that it was “extremely prejudiced” when the trial court refused to allow it to cross-examine the Robinettes’ fact witness, Preston Smith, about whether he had his own pending lawsuit against Lafon and its insurer for 129damages arising out of the conditions at Lafon in the aftermath of Hurricane Katrina.
BY MR. SALLEY:
Q. Sir, isn’t it true that you have a lawsuit pending against Lafon?
MR. IRPINO:
Objection, Your Honor.
THE COURT:
Sustained. Move on.
MR. SALLEY:
Can we approach, judge?
THE COURT:
No. Move on.
“[A] trial court’s ruling on the scope and extent of cross-examination should not be disturbed absent an abuse of discretion.” State v. Brumfield, 96-2667, p. 13 (La. 10/20/98), 737 So.2d 660, 668.
La. C.E. art. 607 governs attacking and supporting the credibility of a witness:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible | anwhen offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. [Emphasis added.]
By its very language (“except as otherwise provided by legislation”), any evidence admissible under La. G.E. art. 607 may be inadmissible under another rule, *88 including La. C.E. art. 403. Preatto v. Tidewater Marine, Inc,, 00-0624, p. 10 (La. App. 4 Cir. 2/6/02), 809 So.2d 1084, 1090. Thus, La. C.E. art. 607 does not restrict the trial court’s discretion to “exclude marginally probative lines of questioning when they become redundant or unduly time-consuming, or are offset by the danger of unfair prejudice, confusion of the issues or misleading the jury.” Id. (citing Comment (h) to La. C.E. art. 607).
Any testimony by Mr. Smith regarding whether he had a lawsuit against Lafon would have no probative value. In attempting to solicit this testimony from Mr. Smith, Lafon was implying that Mr. Smith was deliberately untruthful with the jury about the conditions he saw at Lafon in order to obtain a favorable verdict in his own suit, which we find to be highly speculative. Certainly, the trial court may have reasonably found that this testimony created the risk of undue prejudice to the Robi-nettes, or of misleading or confusing the jury. Finally, considerations of time and judicial economy may also have reasonably impacted the trial court’s ruling. We cannot say that the trial court abused its discretion in prohibiting this cross-examination.

Sixth Assignment of Error

Lafon contends that it was prejudiced when the trial court denied its motion for directed verdict on the Robinettes’ insurance coverage claims, despite the fact that Lafon did not introduce any evidence of coverage, because their attorney | S1 “continued to reference Lafon’s attorneys as ‘attorneys for insurance companies’ throughout the trial, including multiple times in plaintiffs’ closing argument.”
We find no merit in Lafon’s argument that the jury’s verdict was improperly influenced by counsel’s statement at closing argument that “they have the nerve to come here and try to shift the responsibility to the family. The nerve of them. The nerve of these insurance company lawyers.” Although the jury was allowed to consider the issue of insurance coverage, “this in and of itself should not be so corrosive to the deliberative process as to undermine the entire result.” Delaney v. Whitney Nat’l Bank, 96-2144, 97-0254 (La. App. 4 Cir. 11/12/97), 703 So.2d 709, 717.
We find no merit in Lafon’s sixth assignment of error.
CONCLUSION
For the reasons assigned, we affirm in all respects the trial court’s judgment rendered in accordance with the jury’s verdict in favor of the Robinettes and against La-fon.
AFFIRMED

. On January 20, 2015, the trial court signed a Consent Judgment dismissing the Robi-nettes’ claims against Sister Thibodeaux, Sister Martin, Sister Gonzalez, and Sister McDaniel.

. Lafon also filed a "Motion to Confirm Entitlement to Allocation of Third Party Fault at Trial,” which the trial court denied. That judgment is not before us.

. These rules were promulgated in accordance with La. R.S. 40:2009.1-2116.4, and were published in the Louisiana Register, Volume 24, Number 1, January 20, 1998.

. In the event of "in-place sheltering,” the Model Plan set forth seven considerations typically associated with “fast moving emergencies,” such as maintaining contact with fire authorities; covering and protecting food, water, and medications from airborne contamination and contact with waste materials; and obtaining advice from public health authorities regarding the need for decontamination.

. The Lafon Child Care Center and the Mother House are in separate buildings on Chef Menteur Highway.

. In In re Katrina Canal Breaches Litig., 696 F.3d 436, 453 (5th Cir. 2012), residents in New Orleans East alleged that the Corps of Engineers was negligent in the maintenance and operation of MRGO and in failing to construct a surge-protection barrier to protect New Orleans East from flooding. The U.S. Fifth Circuit affirmed the district court’s conclusion that the Corps of Engineers’ conduct was reasonable and that it had no duty to construct a storm-surge barrier.